PEOPLE *v.* HULBERT.

1. RIPARIAN OWNERS—RELATIVE RIGHTS.
   The rights of the several riparian proprietors on a stream or
   an inland lake are equal, each being entitled to a reasonable
   use of the water, though such use may, to some extent, pre-
   judice the other proprietors by impairing the quality of the
   water or diminishing its quantity.

2. SAME—BATHING—CITY WATER SUPPLY.
   A riparian owner on a lake has a right to bathe therein, as
   against a city drawing its water supply from the lake under
   . a like ownership.

3. SAME—POLICE POWER.
   And it is not within the police power of the State to prohibit
   the exercise of such right.

Exceptions before judgment from Calhoun; Smith, J.
Submitted February 21, 1902. (Docket No. 128.) De-
cided June 24, 1902.

Steven S. Hulbert was convicted of polluting the source
of the water supply of the city of Battle Creek by bathing
in Goguac Lake, in violation of section 26 of Act No. 428,
Local Acts 1887. Reversed.

*Steven S. Hulbert* ( *George W. Mechem,* of counsel ),
*in pro. per.*

*Horace M. Oren,* Attorney General, and *Jesse M.
Hatch,* Prosecuting Attorney ( *O. S. Clark,* of counsel ),
for the people.

MOORE, J. Goguac Lake is a natural body of private
water wholly within the township of Battle Creek, which
township adjoins the city of Battle Creek. It has an area
of about 360 acres, and varies in depth from nothing at
the shore line, to 80 feet. The shore line of the lake is

about 5 miles in all, and at the time of the alleged offense was owned as follows: About 200 feet by the city, upon which is its pumping station, and the rest of the 5 miles is owned and occupied by farmers, pleasure resort proprietors, and summer cottagers, the latter holding, some by fee, and others by lease from the farmer owners. At the north end of the lake is a pleasure resort, and scattered around the lake shore are between 40 and 50 cottages, occupied during the summer season by the respective owners, or persons to whom they rent. The lake is accessible from the city by a good highway, a fine bicycle path, and an electric road. It is the only nearby pleasure resort for the citizens of Battle Creek. There are a large number of rowboats, sailboats, and several steamers upon the lake. The riparian uses to which the various owners have put the water are all the uses which farmers and summer cottagers would naturally exercise, viz., fishing, wading, bathing, swimming, washing sheep, watering cattle, pigs, and horses, washing vehicles and clothing, cutting ice, boating, sailing, etc. In the summer of 1884 the respondent first occupied premises at the lake. In 1884, 1885, and 1886 he occupied tents within a few feet of where he erected a cottage in 1887, since which time he has continuously occupied said cottage. Beginning with 1884, he has occupied the premises for the camping season each year, continuously, except two, and every season has entered the water to swim. His investment in cottage and appurtenances is several hundred dollars.

In 1886 the city proposed a system of waterworks, and at some time thereafter determined to take the city water supply from Goguac Lake. For that purpose the city bought a piece of land fronting on the lake at its northerly end, having a shore frontage of about 200 feet, and erected thereon a pumping station. The system is to take the water from the lake by means of an inlet pipe 16 inches in diameter, which runs into the lake. The water is pumped to a standpipe, which is upon a rise of ground a short distance from the lake, and thence is dis-

tributed through pipes of 4 to 16 inches within the city·
limits, the piping now amounting to between 30 and 40
miles. The water is used by the city, and sold to the peo-
ple, and is the only water system. The lake is about 1½
miles long, and is fed by subterranean springs. There is
no outlet except the intake pipe. From the cottage of the
respondent, by water, to the intake pipe, is about three-
quarters of a mile. Quite early in the use of the lake for
municipal purposes, the city pumped out so much water
as to lower the lake. Litigation resulted, and the city
then for certain months in the year turned into the lake
the water from Minges brook, so that the water is not now
lowered by the city, but the effect of turning in the water
from the brook is to make the water harder than it was
before.

The city, although given ample power by the charter to
condemn lands and easements for a water supply upon
paying due compensation for the rights taken, did not
exercise that right, but, because it was a riparian proprie-
tor, claimed the right to use the water of the lake, and
that the other riparian proprietors must do nothing having
a tendency to pollute the waters of the lake. The respond-
ent, having first notified the board of public works of his
intention to do so, made an entry into the waters of the
lake on July 25, 1897, by wading on his own leased land
under water, and swimming in the water flowing over
said land. This he did without malice, and to afford a
test case. He maintained that the difference between the
exercise of the ancient common-law riparian right of bath-
ing and swimming, and those of washing sheep, watering
cattle and horses, running a water-wheel for a mill, etc.,
was a difference only in kind and degree, and that all were
common-law rights incident and appurtenant to the owner-
ship or lawful occupation of land upon an inland lake in
this State. It was the claim of the people that this act of
swimming polluted the source of the water supply, and
was criminal. The respondent was informed against, a
trial was had, and the charge of the court was such that

a conviction followed. The case is brought here by appeal.

Upon the trial several expert witnesses were sworn, who testified that germs might have been thrown off the body of the respondent while swimming, which would produce disease, and that some of those germs might reach the intake pipe, and through it the consumers of the water, and be a source of ill health. It is not shown any such germs ever did reach the intake pipe, or that any illness in Battle Creek could be traced to the use of the water taken from this lake.

A great many interesting questions are raised by the record and presented in the briefs of counsel, but, in our view of the law, it will be unnecessary to discuss many of them. The first question calling for consideration is, Was the act of respondent unlawful? It is a matter of common knowledge that in this State the riparian owners whose lands border upon lakes, and through whose lands streams run, are in the habit of using the streams and lakes by allowing their domestic animals to drink therein, and by drawing therefrom what water may be needed for domestic purposes; and themselves and their families resort to the water of the streams and lakes for the purpose of bathing at suitable seasons of the year. It is also known that, as a rule, the supply of drinking and cooking water is obtained from springs or wells. Will the fact that a lower riparian proprieter decides to use the water of the stream or lake for drinking and cooking purposes make a reasonable use of the water by the upper riparian owners for the purposes of watering cattle and bathing purposes unlawful because to do so has a tendency to make the water less desirable for drinking and cooking purposes? Can the upper riparian proprietors be deprived of such reasonable and ordinary use when the lower proprietor is a city having a large population, by invoking the police power, and without compensation? It will readily be seen these are very important questions. The diligence of able counsel has failed to call our attention to a case on all fours with the one at bar, but the principles involved are not new.

In *Wood* v. *Waud*, 3 Exch. 748, Pollock, C. B., speaking for the court, said:

"We agree with the learned counsel for the plaintiffs in his exposition of the principles which regulate the law as to natural streams, which are fully considered, and placed on their right footing, in the case of *Mason* v. *Hill*, 3 Barn. & Adol. 304; *Id.*, 5 Barn. & Adol. 1; and the authorities there cited. Flowing water, as well as light and air, are in one sense '*publici juris*.' They are a boon from Providence to all, and differ only in their mode of enjoyment. Light and air are diffused in all directions, flowing water in some. When property was established, each one had the right to enjoy the light and air diffused over, and the water flowing through, the portion of soil belonging to him. The property in the water itself was not in the proprietor of the land through which it passes, but only the use of it, as it passes along, for the enjoyment of his property, and as incidental to it. The law is laid down by Chancellor Kent, in 3 Comm. 439, thus: 'Every proprietor of lands on the banks of a river has naturally an equal right to the use of the water.   *   *   * He has no property in the water itself, but a simple usufruct as it passes along.' '*Aqua currit et debet currere*,' is the language of the law; and Mr. Justice Story, in *Tyler* v. *Wilkinson*, 4 Mason, 397 (Fed. Cas. No. 14,312), cited in Gale & W. Easem. p. 131, lays down the same law. In the judgment of Lord Chief Justice Tindal in the case of *Acton* v. *Blundell*, 12 Mees. & W. 324, he treats the right to waters flowing on the surface as arising from the acquiescence of neighboring owners; though he also quotes the judgment of Mr. Justice Story, above referred to, which treats the right as an incident to property; for Mr. Justice Story says: 'The natural stream, existing by the bounty of Providence for the benefit of the land through which it flows, is an incident annexed by operation of the law to the land itself.' Mr. Justice Whitlock, also, in *Sury* v. *Pigot*, Poph. 169, and Crew, C. J., Id., 172, and Lee, C. J., in *Brown* v. *Best*, 1 Wils. 174, treat the right as arising *ex jure naturæ;* and consequently it is not extinguished, as an easement *in alieno solo* would be, by unity.   *   *   *

"In considering this question, it is to be assumed that the plaintiffs' right is established to the use of the water. It is said that the true rule on this subject is laid down by Chancellor Kent (3 Comm. 439, 440) that streams are

meant for the use of men, and that it would be unreasonable, and contrary to the universal consent of mankind, to debar each riparian proprietor from the application of the water to domestic, agricultural, or' manufacturing purposes, provided the use of it be made so as to work no material injury or annoyance to his neighbor; and though there will, no doubt, be, in the exercise of a proper use of water, some evaporation and decrease of it, some variation in the weight and velocity of the current, but the maxim '*De minimis non curat lex*' applies, and a right of action by the proprietor below would not necessarily flow from such use; it would depend on the nature and extent of the injury, and the manner of using the water."

In *Embrey* v. *Owen*, 6 Exch. 353, Baron Parke, speaking for the court, said:

"The law as to flowing water is now put on its right footing by a series of cases beginning with that of *Wright* v. *Howard*, 1 Sim. & S. 190, followed by *Mason* v. *Hill*, 3 Barn. & Adol. 304; *Id.*, 5 Barn. & Adol. 1; and ending with that of *Wood* v. *Waud*, 3 Exch. 748; and is fully settled in the American courts. See 3 Kent, Comm. (6th Ed.) lect. 52, pp. 439, 445. The right to have the stream to flow in its natural state, without diminution or alteration, is an incident to the property in the land through which it passes. But flowing water is *publici juris;* not in the sense that it is a *bonum vacans*, to which the first occupant may acquire an exclusive right, but that it is public and common in this sense only: That all may reasonably use it who have a right of access to it; that none can have any property in the water itself, except in the particular portion which he may choose to abstract from the stream and take into his possession, and that during the time of his possession only. See *Mason* v. *Hill*, 5 Barn. & Adol. 24. But each proprietor of the adjacent land has the right to the usufruct of the stream which flows through it.

"This right to the benefit and advantage of the water flowing past his land is not an absolute and exclusive right to the flow of all the water in its natural state. If it were, the argument of the learned counsel that every abstraction of it would give a cause of action would be irrefragable. But it is a right only to the flow of the water, and the enjoyment of it, subject to the similar rights of all the proprietors of the banks on each side to the reasonable enjoyment of the same gift of Providence. * * *

" 'The owner must so use and apply the water as to work no material injury or annoyance to his neighbor below him, who has an equal right to the subsequent use of the same water. Nor can he, by dams or any obstruction, cause the water injuriously to over-flow the grounds and springs of his neighbor above him. Streams of water are intended for the use and comfort of man; and it would be unreasonable, and contrary to the universal sense of mankind, to debar every riparian proprietor from the application of the water to domestic, agricultural, and manufacturing purposes, provided the use of it be made under the limitations which have been mentioned; and there will, no doubt, inevitably be, in the exercise of a perfect right to the use of the water, some evaporation and decrease of it, and some variations in the weight and velocity of the current. But "*de minimis non curat lex*," and a right of action by the proprietor below would not necessarily flow from such consequences, but would depend upon the nature and extent of the complaint or injury, and the manner of using the water. All that the law requires of the party by or over whose land a stream passes is that he should use the water in a reasonable manner, and so as not to destroy, or render useless, or materially diminish or affect, the application of the water by the proprietors above or below on the stream.'

"* * * On the other hand, one's common sense would be shocked by supposing that a riparian owner could not dip a watering-pot into the stream in order to water his garden, or allow his family or his cattle to drink it. It is entirely a question of degree, and it is very difficult—indeed, impossible—to define precisely the limits which separate the reasonable and permitted use of the stream from its wrongful application; but there is often no difficulty in deciding whether a particular case falls within the permitted limits or not."

In *Merrifield* v. *Lombard*, 13 Allen, 16 (90 Am. Dec. 172), it is said:

"Any diversion or obstruction of the water which substantially diminishes the volume of the stream, so that it does not flow *ut currere solebat*, or which defiles and corrupts it to such a degree as essentially to impair its purity, and prevent the use of it for any of the reasonable and proper purposes to which running water is usually applied, —such as irrigation, the propulsion of machinery, or consumption for domestic use,—is an infringement of the right of other owners of land through which a water-course runs, and creates a nuisance for which those there-

by injured are entitled to a remedy. An injury to the purity or quality of the water, to the detriment of other riparian owners, constitutes, in legal effect, a wrong and an invasion of private right, in like manner as a permanent obstruction or diversion of the water. It tends directly to impair and destroy the use of the stream by others for reasonable and proper purposes. *Mason* v. *Hill*, 2 Nev. & M. 747, 5 Barn. & Adol. 1; *Wood* v. *Waud*, 13 Jur. 472, 3 Exch. 748; 3 Kent, Comm. (6th. Ed.) 439; Ang. Water-Courses, § 136."

In *Sanderson* v. *Coal Co.*, 86 Pa. St. 401 (27 Am. Rep. 711), it is said:

"In an elaborate and carefully considered opinion in *Mason* v. *Hill*, 5 Barn. & Adol. 1, Denman, C. J., held that the possessor of land through which a natural stream runs has the right to the advantage of that stream flowing in its natural course, not inconsistent with a similar right in the proprietors of the land above and below; and that neither can any proprietor above diminish the quantity or injure the quality of the water, nor can any proprietor below throw back the water without his license or grant. It was one of the features of that case that the water which the defendant had the right to use, subject to the duty of returning it, was heated when it was returned to the stream, and the jury had assessed damages for that. The chief justice said, in entering judgment: 'As to the right to recover for the injury sustained by the water being returned in a heated state, there can be no question.'

"In *Wood* v. *Sutcliffe*, 16 Jur. 75, 8 Eng. Law & Eq. 217, an injunction was granted to restrain the defendant, against whom a recovery had been had at law, from pouring dye wares, dye liquors, madder, indigo, or potash into a channel that connected his dye works with a stream called the 'Bowling Beck,' on which, below the works, the cotton mill of the plaintiffs was situated, and in the use of the water of which they claimed prescriptive rights. 'I am satisfied from the evidence,' the vice-chancellor remarked in the course of his opinion, 'that to some considerable extent the pollution of this stream is inevitable, and that no court of law or court of equity, nor all the courts in the world, except there were a power of removing all that mass of human beings which now congregate about its banks, ever could restore it to the state in which it once was. But still it does not follow, because

there be a certain degree of pollution, which cannot be very accurately measured, and which is inevitable, that, therefore, everybody has a right to pollute the stream by pouring in immense quantities of filth and pollution from his own works, to make it ten thousand times worse.'"

In *Greene* v. *Nunnemacher*, 36 Wis. 50; the following language is used:

"If the plaintiff is a riparian proprietor, he has the undoubted right to enjoy the use of the waters of the river for his cattle and for domestic purposes without having their purity affected or their quality destroyed by the upper proprietor. * * * And, if this is really the situation of his premises, it needs no argument to show that, so far as he is concerned, he has the right to insist that the defendants shall not foul and corrupt the waters by discharges and slops from their distillery and hog and cattle yards, so as to render the waters unfit for agricultural and domestic purposes."

In *Dwight Printing Co.* v. *City of Boston*, 122 Mass. 583, it is said:

"The riparian proprietors higher up still retain all their common-law rights in the river, so far as they are not inconsistent with the use defined in the statute. They certainly are not prohibited from drawing water from the river for domestic purposes, or from watering cattle in it, or from cutting ice."

In *Strobel* v. *Salt Co.*, 164 N. Y. 303 (58 N. E. 142, 51 L. R. A. 687, 79 Am. St. Rep. 643), it is said:

"There is nothing about the case now before us to take it out of the general rules governing the rights of riparian owners. Those rules are well established in this State, and, so far as material to the case before us, are, in the absence of modification by grant or prescription, as follows: A riparian owner is entitled to a reasonable use of the water flowing by his premises in a natural stream, as an incident to his ownership of the soil, and to have it transmitted to him without sensible alteration in quality or unreasonable diminution in quantity. While he does not own the running water, he has the right to a reasonable use of it as it passes by his land. As all other owners upon the same stream have the same right, the right of no

one is absolute, but is qualified by the right of the others to have the stream substantially preserved in its natural size, flow, and purity, and to protection against material diversion or pollution. This is the common right of all, which must not be interfered with by any. The use by each must, therefore, be consistent with the rights of the others, and the maxim of ' *sic utere tuo* ' observed by all. The rule of the ancient common law is still in force, '*Aqua currit et debet currere, ut currere solebat.*' Consumption by watering cattle, temporary detention by dams in order to run machinery, irrigation (when not out of proportion to the size of the stream), and some other familiar uses, although in fact a diversion of the water involving some loss, are not regarded as an unlawful diversion, but are allowed as a necessary incident to the use, in order to effect the highest average benefit to all the riparian owners. As the enjoyment of each must be according to his opportunity, and the upper owner has the first chance, the lower owners must submit to such loss as is caused by reasonable use. Surrounding circumstances, such as the size and velocity of the stream, the usage of the country, the extent of the injury, convenience in doing business, and the indispensable public necessity of cities and villages for drainage, are also taken into consideration; so that a use which, under certain circumstances, is held reasonable, under different circumstances would be held unreasonable. It is also material sometimes to ascertain which party first erected his works and began to appropriate the water. *Clinton* v. *Myers*, 46 N. Y. 511 (7 Am. Rep. 373); *New York Rubber Co.* v. *Rothery*, 132 N. Y. 293 (28 Am. St. Rep. 575, 30 N. E. 841); *Smith* v. *City of Brooklyn*, 160 N. Y. 357 (54 N. E. 787, 45 L. R. A. 664); *Prentice* v. *Geiger*, 74 N. Y. 341; *Bullard* v. *Manufacturing Co.*, 77 N. Y. 525; *Merritt* v. *Brinkerhoff*, 17 Johns. 306 (8 Am. Dec. 404); *Crooker* v. *Bragg*, 10 Wend. 260 (25 Am. Dec. 555); *Arnold* v. *Foot*, 12 Wend. 330; *Tyler* v. *Wilkinson*, 4 Mason, 397 (Fed. Cas. No. 14,312); *Columbus, etc., Iron Co.* v. *Tucker*, 48 Ohio St. 41 (29 Am. St. Rep. 528, 26 N. E. 630, 12 L. R. A. 577); *Beach* v. *Zinc Co.*, 54 N. J. Eq. 65 (33 Atl. 286); *St. Helen's Smelting Co.* v. *Tipping*, 11 H. L. Cas. 642; *Crossley & Sons* v. *Lightowler*, L. R. 3 Eq. Cas. 279, L. R. 2 Ch. App. 478; *Pennington* v. *Coal Co.*, L. R. 5 Ch. Div. 769; *Attorney General* v. *Lunatic Asylum*, L. R. 4 Ch. App. 146;

*Hodgkinson* v. *Ennor*, 4 Best & S. 229; 3 Kent, Comm.
439; Gould, Waters, § 219; Higgins, Water-Courses, 132;
Washb. Easem. (4th Ed.) 215; 1 Wood, Nuis. (3d Ed.)
§§ 364, 427.

"The question of reasonable use is generally a question
of fact; but whether the undisputed facts, and the neces-
sary inferences therefrom, establish an unreasonable use,
is a question of law. When the diversion or pollution
(which is treated as a form of diversion) is caused by a
new and extraordinary method of using the water, hither-
to unknown in the State, and such method not only per-
manently diverts a large quantity of water from the stream,
but also renders the rest so salt at times that cattle will
not drink it unless forced to by necessity, fish are destroyed
in great numbers, vegetation is killed, and machinery
rusted, such use, as a matter of law, is unreasonable, and
entitles the lower riparian owner to relief. Where the
natural and necessary result of the place selected and the
method adopted by an upper riparian owner in the con-
duct of his business is to cause material injury to the
property of an owner below, a court of equity will exercise
its power to restrain on account of the inadequacy of the
remedy at law, and in order to prevent a multiplicity
of suits. The lower riparian owners are entitled to a fair
participation in the use of the water, and their rights can-
not be cut down by the convenience or necessity of the
defendant's business. 'The necessities of one man's busi-
ness cannot be the standard of another's rights in a thing
which belongs to both.' *Wheatley* v. *Chrisman*, 24 Pa.
St. 298 (64 Am. Dec. 657). While the courts will not
overlook the needs of important manufacturing interests,
nor hamper them for trifling causes, they will not permit
substantial injury to neighboring property, with a small
but long-established business, for the purpose of enabling
a new and great industry to flourish. They will not
change the law relating to the ownership and use of prop-
erty in order to accommodate a great business enterprise.
According to the old and familiar rule, every man must
so use his own property as not to injure that of his neigh-
bor; and the fact that he has invested much money and
employs many men in carrying on a lawful and useful
business upon his own land does not change the rule, nor
permit him to permanently prevent a material portion of
the water of a natural stream from flowing over the land
of a lower riparian owner, or to so pollute the rest of the
stream as to render it unfit for ordinary use."

In *Trevett* v. *Prison Ass'n*, 98 Va. 332 (36 S. E. 373, 50 L. R. A. 564, 81 Am. St. Rep. 727), the following language is used:

"In 1 Wood, Nuis. (3d Ed.) § 427, it is said:

"'The right of a riparian owner to have the water of a stream come to him in its natural purity is as well recognized as the right to have it flow to his land in its usual flow and volume. But in reference to this, as with the air, it is not every interference with the water that imparts impurities thereto that is actionable, but only such as impart to the water such impurities as substantially impair its value for the ordinary purposes of life, and render it measureably unfit for domestic purposes; or such as causes unwholesome or offensive vapors or odors to arise from the water, and thus impairs the comfortable or beneficial enjoyment of property in its vicinity; or such as, while producing no actual sensible effect upon the water, are yet of a character calculated to disgust the senses, such as the deposit of the carcasses of dead animals therein, or the erection of privies over a stream, or any other use calculated to produce nausea or disgust in those using the water for the ordinary purposes of life, or such as impair its value for manufacturing purposes.'

"The great principle upon which the law, as thus stated, rests, is that every man must use his own property so as not to injure that of another. It is true, as urged by counsel for defendant in error, that the operation of this principle is qualified by another maxim, founded in natural law, that he who exercises only his own legal rights injures no one. The motive, good or bad, which influenced the action complained of, is generally of no importance whatever, for it is well stated by an eminent writer upon this subject that 'whatever one has a right to do, another can have no right to complain of.' Cooley, Torts, § 6, p. 630. If, therefore, a lawful act is done in a lawful manner, though another may be injured by it, the law affords no remedy. It is *damnum absque injuria.*

"It was said by the court in *Merrifield* v. *City of Worcester*, 110 Mass. 219 (14 Am. Rep. 592):

"'Cultivating and fertilizing the lands bordering on the stream, and in which are its sources, their occupation by farmhouses and other erections, will unavoidably cause impurities to be carried into the stream. As the lands are subdivided, and their occupation and use become multifarious, these causes will be rendered more operative, and their effects more perceptible. The water may thus be rendered unfit for many uses for which it had before been suitable;

but, so far as that condition results only from reasonable use of the stream in accordance with the common right, the lower riparian proprietor has no remedy. When the population becomes dense, and towns or villages gather along its banks, the stream naturally and necessarily suffers still greater deterioration. Roads and streets crossing it, or running by its side, with their gutters and sluices discharging into it their surface water collected from over large spaces, and carrying with it in suspension the loose and light material that is thus swept off, are abundant sources of impurity, against which the law affords no redress by action.'

"* * * Tracing the law from the time of Lord Coke to more recent times, the court [in *Mayor, etc., of Balti-more* v. *Manufacturing Co.*, 59 Md. 96], speaking through Judge Alvey, declares that:

" 'All common-law authorities agree that a riparian owner has the right to the natural stream of water flowing by or through his land in its ordinary, natural state, both as to its quantity and quality, as incident to the right to the land on or through which the water-course runs. * * * If, therefore,' said the court, 'the defendants, being upper riparian proprietors, and as such entitled to the ordinary use of the water, including the right to apply it in a reasonable way to purposes of trade and manufacture, are using the water of the stream in an unreasonable manner, and have defiled the same in such manner and to such an extent as to operate an actual invasion of the rights of the complainants, the latter are entitled to redress by action at law, and, in case the nuisance be continued, to summary relief by injunction. * * *

" 'What nature and extent of pollution of the stream will call for the active interference of the court is not in all cases easy to define. It is not every impurity imparted to the water, however small in degree, that will be the subject of an injunction. All running streams are, to a certain extent, polluted; and especially are they so when they flow through populous regions of country, and the waters are utilized for mechanical and manufacturing purposes. The washings of the manured and cultivated fields, and the natural drainage of the country, of necessity bring many impurities to the stream; but these and the like sources of pollution cannot ordinarily be restrained by the court. * * * Therefore, when we speak of the right of each riparian proprietor to have the water of a natural stream flow through his land in its natural purity, those descriptive terms must be understood in a comparative sense, as no proprietor does receive, nor can he reasonably expect to receive, the water in a state of entire purity. But any use that materially fouls and adulterates the water, or the deposit or discharge therein of

any filthy or noxious substance that so far affects the water as to impair its value for the ordinary purposes of life, will be deemed a violation of the rights of the lower riparian proprietor, and for which he will be entitled to redress. Anything that renders the water less wholesome than when in its ordinary natural state, or which renders it offensive to taste or smell, or that is naturally calculated to excite disgust in those using the water for the ordinary purposes of life, will constitute a nuisance, and for the restraint of which a court of equity will interpose.' "

In *Gehlen Bros.* v. *Knorr*, 101 Iowa, 700 (70 N. W. 757, 36 L. R. A. 697, 63 Am. St. Rep. 416), it is said:

"We need only consider, then, what the law is as to the rights of riparian owners to the use of the waters of a nonnavigable stream for artificial purposes. Some general propositions may well be stated. The law is that as to such use, and in the absence of superior rights acquired by license, grant, or prescription, the rights of such proprietors in the water of the stream are equal. *Willis* v. *City of Perry*, 92 Iowa, 297 (60 N. W. 727, 26 L. R. A. 124). It follows, therefore, that the defendants had the right to use the water reasonably, having reference to plaintiffs' rights therein. Washb. Easem. p. 379. Broadly stated, the general rule is that the owner of the land through which a stream of water runs has a right to have it flow over his land in the natural channel, undiminished in quantity, and unimpaired in quality, except in so far as diminution or contamination is inseparable from a reasonable use of such water. *Willis* v. *City of Perry, supra; Ferguson* v. *Manufacturing Co.*, 77 Iowa, 578 (42 N. W. 448, 14 Am. St. Rep. 319); *Spence* v. *McDonough*, 77 Iowa, 462 (42 N. W. 371); 28 Am. & Eng. Enc. Law, p. 948; *Elliot* v. *Railroad Co.*, 10 Cush. 191 (57 Am. Dec. 85, notes); *Moulton* v. *Water Co.*, 137 Mass. 163; *Garwood* v. *Railroad Co.*, 83 N. Y. 400 (38 Am. Rep. 452); *Brookville, etc., Hydraulic Co.* v. *Butler*, 91 Ind. 138 (46 Am. Rep. 580); *Heilbron* v. *Canal Co.*, 75 Cal. 426 (17 Pac. 535, 7 Am. St. Rep. 183); *Dumont* v. *Kellogg*, 29 Mich. 420 (18 Am. Rep. 102); *Union Mining Co.* v. *Dangberg*, 2 Sawy. 450 (Fed. Cas. No. 14,370); *Tyler* v. *Wilkinson*, 4 Mason, 397 (Fed. Cas. No. 14,312); *Bullard* v. *Manufacturing Co.*, 77 N. Y. 530; *Palmer* v. *Mulligan*, 3 Caines, 307 (2 Am. Dec. 270); *Davis* v. *Getchell*, 50 Me. 602 (79 Am. Dec. 636, note); *Wadsworth* v. *Tillotson*, 15 Conn. 366 (39 Am. Dec. 391);

*Haskins* v. *Haskins*, 9 Gray, 390; *Snow* v. *Parsons*, 28 Vt. 459 (67 Am. Dec. 723); *City of Springfield* v. *Harris*, 4 Allen, 494 (81 Am. Dec. 715); *Red River Roller Mills* v. *Wright*, 30 Minn. 249 (15 N. W. 167, 44 Am. Rep. 194). No statement can be made as to what is such reasonable use which will, without variation or qualification, apply to the facts of every case. But in determining whether a use is reasonable we must consider what the use is for; its extent, duration, necessity, and its application; the nature and size of the stream, and the several uses to which it is put; the extent of the injury to the one proprietor and of the benefit to the other; and all other facts which may bear upon the reasonableness of the use. *Red River Roller Mills* v. *Wright*, 30 Minn. 249 (15 N. W. 167, 44 Am. Rep. 194), and cases cited; Washb. Easem. p. 379.

"Now, while one riparian proprietor may not divert the water of a stream so as to deprive a lower proprietor on the same stream of the benefit thereof, such upper proprietor may reasonably detain the water for proper purposes. Washb. Easem. p. 380; *Brookville, etc., Hydraulic Co.* v. *Butler, supra;* 28 Am. & Eng. Enc. Law, p. 955; Gould, Waters, § 213; Ang. Water-Courses, §§ 90–96; *Gillett* v. *Johnson*, 30 Conn. 180. The doctrine that such use by the upper proprietor may result in diminishing the quantity of water which will go down the stream, and may affect the current by retarding the flow to a reasonable extent, and still be consistent with the existence of a common right, was early held in this country, and has been constantly adhered to. *Tyler* v. *Wilkinson, supra; Dumont* v. *Kellogg, supra; Bullard* v. *Manufacturing Co., supra; Eidemiller Ice Co.* v. *Guthrie*, 42 Neb. 238 (60 N. W. 717, 28 L. R. A. 581); Gould, Waters, § 191; *Palmer* v. *Mulligan, supra; Davis* v. *Getchell, supra; Van Hoesen* v. *Coventry*, 10 Barb. 518; *Oregon Iron Co.* v. *Trullenger*, 3 Or. 1; 3 Kent, Comm. 439; *Keeney & Wood Manfg. Co.* v. *Union Manfg. Co.*, 39 Conn. 577; *Timm* v. *Bear*, 29 Wis. 254; *Whaler* v. *Ahl*, 29 Pa. St. 98; *Gould* v. *Boston Duck Co.*, 13 Gray, 442. If the general rule that each riparian proprietor is entitled to the flow of the stream according to its natural course, without interruption or diminution, should be strictly adhered to, it would result in a virtual abrogation of the well-settled doctrine that the rights of all proprietors of the stream are equal, and would 'preclude the best use of flowing waters in most cases; and, where power is

desired, the rule must yield to the necessity of gathering
the water into reservoirs.   It is lawful to do this where it
is done in good faith, for a useful purpose, and with as
little interference with the rights of other proprietors as is
reasonably practicable under the circumstances.'   Cooley,
Torts (1st Ed.), p. 584; *Tyler* v. *Wilkinson, supra.*   In
*Dumont* v. *Kellogg, supra,* it was held, in an action by
a mill proprietor against one having a mill and dam above
him on the same stream, for damages caused by detention
of the water, that it could not be said that such upper pro-
prietor had no right to use the water to the prejudice of
such lower proprietor; nor could it be held that such upper
proprietor could not lawfully divert any of the water which
would otherwise flow down the stream.   The court said
the real question was 'whether, under all the circumstan-
ces of the case, the use of the water by one is reasonable
and consistent with a correspondent enjoyment of right
by the other.'"

In *Dumont* v. *Kellogg,* 29 Mich. 420 (18 Am. Rep.
102), Justice COOLEY, speaking for the court, said :

"But as between two proprietors, neither of whom has
acquired superior rights to the other, it cannot be said that
one 'has no right to use the water to the prejudice of the
proprietor below him,' or that he cannot lawfully 'diminish
the quantity which would descend to the proprietor below,'
or that 'he must so use the water as not materially to
affect the application of the water below, or materially to
diminish its quantity.'   Such a rule would be, in effect,
this :   That the lower proprietor must be allowed the enjoy-
ment of his full common-law rights as such, not diminished,
restrained, or in any manner limited or qualified by the
rights of the upper proprietor, and must receive the water
in its natural state, as if no proprietorship above him
existed.   Such a rule could not be the law so long as
equality of right between the several proprietors was
recognized, for it is manifest it would give to the lower
proprietor superior advantages over the upper, and in
many cases give him in effect a monopoly of the stream.
" Cases may unquestionably be found in which the rule
of law is laid down as broadly as it was given by the cir-
cuit judge in this case, but an examination of them will
show either that the facts were essentially different, or
that the general language was qualified by the context.
Thus the language employed in the first instruction as

above given seems to have been quoted from Lord Tenterden in *Mason* v. *Hill*, 3 Barn. & Adol. 312. But there it had reference to a case of diversion of water, and was strictly accurate and appropriate. The same language substantially is made use of in *Twiss* v. *Baldwin*, 9 Conn. 291; *Wadsworth* v. *Tillotson*, 15 Conn. 373 (39 Am. Dec. 391); *Arnold* v. *Foot*, 12 Wend. 331; and probably in many other cases; and is adopted by Chancellor Kent in his Commentaries (volume 3, p. 439). See, also, *Bealey* v. *Shaw*, 6 East, 208; *Agawam Canal Co.* v. *Edwards*, 36 Conn. 497; *Williams* v. *Morland*, 2 Barn. & C. 913; *Mason* v. *Hill*, 5 Barn. & Adol. 1; *Tillotson* v. *Smith*, 32 N. H. 95 (64 Am. Dec. 355). But, as between different proprietors on the same stream, the right of each qualifies that of the other, and the question always is, not merely whether the lower proprietor suffers damage by the use of the water above him, nor whether the quantity flowing on is diminished by the use, but whether, under all the circumstances of the case, the use of the water by one is reasonable and consistent with a correspondent enjoyment of right by the other.

" 'Each proprietor is entitled to such use of the stream so far as it is reasonable, conformable to the usages and wants of the community, and having regard to the progress of improvement in hydraulic works, and not inconsistent with a like reasonable use by the other proprietors of land on the same stream above and below.' Shaw, C. J., in *Cary* v. *Daniels*, 8 Metc. (Mass.) 476 (41 Am. Dec. 532).

" 'The common use of the water of a stream by persons having mills above is frequently, if not generally, attended with damage and loss to the mills below; but that is incident to that common use, and for the most part unavoidable. If the injury is trivial, the law will not afford redress, because every person who builds a mill does it subject to this contingency. The person owning an upper mill on the same stream has a lawful right to use the water, and may apply it in order to work his mills to the best advantage, subject, however, to this limitation: That if, in the exercise of this right, and in consequence of it, the mills lower down the stream are rendered useless and unproductive, the law in that case will interpose and limit this common right so that the owners of the lower mills shall enjoy |a fair participation.' Woodworth, J., in *Merritt* v. *Brinkerhoff*, 17 Johns. 321 (8 Am. Dec. 404).

"It is a fair participation and a reasonable use by each that the law seeks to protect. Such interruption in the

flow 'as is necessary and unavoidable by the reasonable and proper use of the mill privilege above' cannot be the subject of an action. *Chandler* v. *Howland*, 7 Gray, 350 (66 Am. Dec. 487). And see *Embrey* v. *Owen*, 6 Exch. 353; *Hetrich* v. *Deachler*, 6 Pa. St. 32; *Hartzall* v. *Sill*, 12 Pa. St. 248; *Pitts* v. *Lancaster Mills*, 13 Metc. (Mass.) 156; *Bliss* v. *Kennedy*, 43 Ill. 68."

It is very clear from these cases that the lower proprietor has no superior right to the upper one, and may not say to him that, because the lower proprietor wants to use the water for drinking purposes only, the upper proprietor may not use the water for any other purpose. Each proprietor has an equal right to the use of the stream for the ordinary purposes of the house and farm, even though such use may in some degree lessen the volume of the stream, or affect the purity of the water. *Hazeltine* v. *Case*, 46 Wis. 391 (1 N. W. 66, 32 Am. Rep. 715); *Ulbricht* v. *Water Co.*, 86 Ala. 587 (6 South. 78, 4 L. R. A. 572, 11 Am. St. Rep. 72); 1 Lewis, Em. Dom. § 65. This right is not affected by the fact that the lower proprietor is a municipality instead of an individual. *Smith* v. *City of Rochester*, 92 N. Y. 463 (44 Am. Rep. 393); *Haupt's Appeal*, 125 Pa. St. 211 (17 Atl. 436, 3 L. R. A. 536). It is not believed a case can be found where, out of deference to the rights of the lower riparian proprietor, it is made unlawful for the upper proprietor to make such reasonable and ordinary use of the water passing over his land as was made by the respondent in this case.

It is insisted by the people that, under the police power, it was competent to forbid any act on the part of the upper proprietor that would tend to impair the public health. It may be conceded that the police power of the State is very broad, but our attention has not been called to any principle of law, or to any case, the practical application of which will enable a village, city, or other municipality, for the purpose of obtaining a water supply, to prevent the ordinary and reasonable use of the waters of an inland lake or stream by an upper riparian proprietor, without

.the exercise of the right of eminent domain or without compensation.

In what we have said we do not mean to intimate that an upper proprietor may convert his property into a summer resort, and invite large numbers of people to his premises for purposes of bathing, and give them the right possessed only by the riparian owner and his family. We are undertaking to decide only the case which is presented here. Upon the record as made, we think the court should have directed a verdict in favor of respondent.

The conviction is reversed, and a new trial ordered.

HOOKER, C. J., GRANT and MONTGOMERY, JJ., concurred. LONG, J., did not sit.