TOWER *v.* TOWNSHIP OF SOMERSET.

1. Drains — Highways — Natural Watercourses — Neighborhood Drain.

A zigzag channel along a highway, formed by the elements in consequence of a sluice under the highway becoming obstructed, does not, merely by the highway officers neglecting to restore the sluice, become a neighborhood drain which abutting owners have a right to insist shall carry the water that formerly came upon their land through the sluice.

2. Waters and Watercourses — Highways—Surface Waters —Flowage.

Abutting owners cannot compel highway officers to restrain surface water from flowing naturally across the highway onto their land.

3. Same—Estoppel.

Highway officers are not estopped from restoring a sluice, by means of which surface water is conducted under the highway onto complainant's land, by the facts that, at the time the sluice became obstructed, the land on both sides of the highway belonged to the same person, and, at the time complainant acquired his title, the water was accustomed to find an outlet without crossing the highway.

4. Chancery Appeals—Record—Prolixity.

The habit of printing the entire stenographer's minutes, even in chancery cases, without the elimination of immaterial testimony, repetitions, and arguments of counsel, is not to be commended.

5. Costs—Chancery Appeal—Prolix Record.

Costs in chancery appeals being within the discretion of the court, only the expense of printing a fair proportion of an unnecessarily prolix record will be allowed on reversal.

Appeal from Hillsdale; Chester, J.   Submitted January 12, 1906.   (Docket No. 62.)   Decided March 5, 1906.

Bill by Sherman L. Tower and Lewis E. Tower against the township of Somerset and Alfred Sutfin, highway commissioner, to restrain the construction of a sluiceway.

From a decree for complainants, defendants appeal. Reversed, and bill dismissed.

The bill of complaint was filed June 24, 1903, to restrain the defendant township and highway commissioner from constructing a sluiceway across the public highway from the north side of the highway to the south side, so that surface water would run upon the complainants' land. The situation can better be understood from the accompanying plat.

In June, 1889, one Jabin Strong owned the land immediately south of the highway, 212 acres, except the schoolhouse site of about one acre. He also owned 147 acres north of the highway, known as the Miner farm, separated only from the other by the highway. Complainant Sherman Tower owned 40 acres east of the north and south highway, as shown in the plat. In 1889, Jabin Strong deeded both farms to Robert and Homer Strong. In 1896, one Koon, by foreclosure proceedings, obtained title to both farms. In 1897, Koon sold the farm south of the turnpike to the complainants, and in 1898, he sold the farm north thereof to Robert Strong. On June 23, 1903, complainants obtained title to the schoolhouse lot. The land on both sides of the turnpike slopes to the south. Bundy's hill is very steep, and in case of heavy rains the water comes down in large quantities to the highway. From the point where the water from Bundy's hill strikes the turnpike to the 40-rod point, there is a fall of 34 feet. In its natural state the most of the water from Bundy's hill and adjoining lands to the west flowed across the highway and onto the lands of the complainants, the most of it finding its way into the east pond. A part flowed north and found its way into Miner pond. The court finds:

"The surface waters from the side hill on the east part of the Miner farm formed washouts or small gullies which carries the water to and across the Chicago turnpike, about eight rods east of the point where the north and

south road intercepts the turnpike; then the water flowed
west to the corner, thence south in the north and south
road on the east side of the drive about 15 or 20 rods, then
it crossed the north and south road to the southeast cor-
ner of the schoolhouse lot; then on the Strong farm in a
wash or gully into the east pond hole.   The township

A to B - present course of ditch
   old water course
B - forty rod point
≡≡≡≡ Gullies
C - proposed sluice

authorities maintained a sluice across the Chicago turn-pike, about eight rods east of the corners, and also across the north and south road during all those years, and until June, 1892."

In June, 1892, there was a very heavy rain, called a cloud-burst. The water poured down from Bundy's hill, washed sand and dirt into the sluiceway, filling it up, and then turned west, running along the north side of the turn-pike, cutting a zigzag ditch for itself down to what on the plat is known as 40-rod point, marked "B." From there some of it at least, and at times perhaps all of it, flowed north into the Miner pond. From that time the township au-thorities did not repair or replace the sluice across the turnpike, but contented themselves with repairing the roadbed so as to protect it against the waters flowing down this zigzag channel.

Subsequently, and in about 1896, the water washed sand, etc., into the channel from the 40-rod point leading to Miner pond, washed out the highway, and ran onto complainants' land, there washing out well-defined gullies as it had previously done on the land north of the highway. The highway authorities then let a contract to fix this place so that the water would not run across the turnpike. This was not successful, and the water again washed out the turnpike at that point. The land on the northerly side of the turnpike is a foot higher than that on the southerly side. The flowing of the water across the turn-pike at 40-rod point kept it in bad condition. All the surface water has not flowed down this ditch or channel which the water itself made, but part of it has run over the highway onto the complainants' lands. It would nearly all run there but for the highway. In 1903 the township authorities decided to build a sluice at point "C," across the highway so that the water would flow onto the old schoolhouse site and from there into the east pond. It was to restrain such action on the part of the township authorities that this bill is filed. The court found as a fact that the running of the water through this proposed sluice-

way onto the defendants' land would result in only nominal damages to them. Some of the witnesses were of opinion that the water would be a benefit to them. The court not only entered a decree restraining the construction of the sluiceway, but perpetually enjoining the township authorities —

"From permitting said waters or any part or parcel thereof to flow across or over said Chicago turnpike upon the lands of said complainants, and from permitting said ditch or channel on the northerly side of the traveled part of said highway to become filled up or out of repair, or in such condition as not to carry and conduct the water along said course, and to prevent the same from crossing said Chicago turnpike, finding lodgment upon the lands of said complainants or any part or parcel thereof."

*F. A. Lyon,* for complainants.

*Frankhauser & Cornell,* for defendants.

GRANT, J. (*after stating the facts*). 1. Complainants insist that this channel which the water had worn had become a neighborhood drain within *Freeman v. Weeks,* 45 Mich. 335, 48 Mich. 255. This case and that have no elements in common. In that case the ditch was dug by common consent. The defendant who obstructed it assisted himself in digging it. The parties actively acquiesced in it. In the case at bar the elements had obstructed the original sluice through which the water ran and had worn out another zigzag channel along the highway. No active steps were taken to clean out the old sluiceway, and the public authorities contented themselves with repairing the highway when the water encroached upon it in this new channel. In heavy rains some of the water continued to flow over the highway. There is no evidence that the defendants or the owners had said or done anything which recognized the new channel as conclusive upon their rights. The abutting owners simply kept silence, and the township authorities endeavored to protect the highway from the encroachments of the

water wherever it threatened the safety of travelers. Failing after repeated efforts to accomplish the desired results, the defendants concluded to reconstruct the old sluice. Yet it is now sought to, and the decree does, compel the township authorities to dam the surface water which runs down against the highway, so as to effectually prevent any running across the highway to the complainants' land — not only that which could flow in the new channel, but also the excess which naturally flows across the highway, and to prevent such flowage for a distance of 40 rods. Even if the complainants could maintain an injunction at all, it could only be maintained against the quantity which flowed in the channel and not against the natural overflow.

2. Complainants insist that the natural watercourse, so diverted when all the lands belonged to one party, was continued until the title to the lands was divided and the diversion recognized as permanent, and that they are therefore relieved from the servitude of the water. This is not a case between the owners of dominant and servient estates. The owners of the dominant estate are not parties to the bill. It is between the abutting owner owning the lower estate and the highway authorities charged with the duty of keeping the highway in reasonable repair for public travel. Complainants have obtained no right by prescription. *Mathewson* v. *Hoffman*, 77 Mich. 420, 433 (6 L. R. A. 349); *Jones* v. *Van Bochove*, 103 Mich. 101; Gould on Waters, § 279. But they insist that the highway authorities are estopped to now turn the water in the natural direction and where it had flowed prior to 1892. The channel made in 1892 at the 40-rod point, by which a portion of the water was turned into Miner pond, was closed in 1896 by the same elements that closed the upper sluiceway in 1892. The gullies on the north side of the highway at this point do not come within 12 feet of the highway, while the gullies upon the south side come close to the highway line. All these gullies on both sides have been washed out without the action of man, but by

the swift rush of the water in seeking outlets. Clearly the highway authorities have no right to there construct a dam and turn all the water upon the abutting owner upon the north. Neither have they the right to enter upon land and dig a channel for the water. If the owner of both estates had dug a channel diverting the water, and afterwards had sold the servient estate with the water so diverted, undoubtedly he would be estopped to again turn the water onto the servient estate. Perhaps he would have been estopped if the elements had worn a channel on his dominant estate, and he had afterwards sold the servient estate. But does that rule apply to municipal authorities under the facts of this case? A party can only be estopped where the other party is misled to his injury. The complainants were fully cognizant of the situation. They knew when they purchased the servient estate of the natural flow of water over their lands; that some of it did still flow over; that the channel was not made by man, but by the elements, that it was the duty of the township authorities to do everything which would not injure abutting owners to render the highway safe for travel. They have not been damaged. Why should the defendant be estopped and compelled to maintain dams to prevent the flow of water into its natural course upon complainants' lands when they can receive no damage (*Hotz* v. *Hoyt*, 135 Ill. 388; *McCormick* v. *Kinsey*, 10 Pa. Super. Ct. Rep. 607; 2 Farnham on Waters and Water Rights, p. 963), and where the township authorities have acquired no right by prescription to dam the water back upon the upper proprietor? 3 Farnham on Waters and Water Rights, p. 2635; *Tootle* v. *Clifton*, 22 Ohio St. 247. We think this is not a case for the application of the doctrine of estoppel, and that the defendants were in the performance of a legal duty and right in the construction of this sluice.

"Highway commissioners have the right to have the surface water, falling or coming naturally upon the highway, drain through the natural and usual channel upon

and over the lower lands," and may construct drains or ditches for that purpose. 2 Farnham on Waters and Water Rights, p. 969.

One of the counsel apologizes for this prolix record. We think it is unnecessarily long. In settling the case much of the testimony and many of the remarks of counsel could have been eliminated, and much time and labor saved in the examination of the record. The habit of printing the entire stenographer's minutes, even in chancery cases, is not to be commended. It is true that the case is to be heard in this court de novo, but the elimination of immaterial testimony, repetitions, and arguments of counsel, and a condensation of the record, aid the court materially in reaching the essential facts. The costs being in the discretion of the court, it is ordered that the appellants recover only half of the cost for printing the record.

Decree reversed, and the bill dismissed.

MCALVAY, BLAIR, MONTGOMERY, and OSTRANDER, JJ., concurred.