# JANUARY TERM, 1915.*

---

VILLAGE OF SAND LAKE *v.* ALLEN.

WATERS AND WATERCOURSES—DRAINAGE—SURFACE FLOW—OBSTRUC-
TION.

Where complainants averred that the surface water from
a village street for upwards of thirty years passed over
the property of the defendants and drained into a neigh-
boring lake, and that defendants attempted to obstruct
the natural flow of the water by drawing earth and build-
ing a dam one and one-half to two feet high across a
ravine upon their property through which the water
passed, and where defendants claimed that by the con-
struction of certain ditches and tile drains a larger quan-
tity of water than the natural flow passed onto their
property and that the water had become polluted and un-
healthful, affecting injuriously a house in which they
lived, the trial court, upon conflicting evidence, was
justified in granting an injunction in favor of complainant
village.

Appeal from Kent; Perkins, J. Submitted Janu-
ary 13, 1915. (Docket No. 79.) Decided March 18,
1915.

Bill by the village of Sand Lake and others against
Frank Allen and Emma Allen to enjoin an obstruc-
tion of the natural flow of a watercourse. From a de-
cree for complainants, defendants appeal. Affirmed.

*Charles Rarden* and *Ellis & Ellis,* for appellants.

*Louis T. Herman,* for appellees.

MOORE, J. The village of Sand Lake is located in Nelson township on the north line of the county of Kent; the north line of the village being the county line. The county north of the village is Montcalm county. The business street of the village runs east and west.

It is the claim of complainants that the surface water of the north side of this street for a block west of Fourth street for more than 30 years found its way east to Fourth street; then nearly north on Fourth street for approximately a block and a half; then east under the tracks of the Grand Rapids & Indiana Railroad; then across Third street, and across lots 5, 4, 3, 2, and 1 of block 1, which belongs to complainant Giddings; thence east across First street until it came to a small piece of land on the east side of First street belonging to defendants; thence turning north through a ravine on this land; thence across the county line road to a tract of land owned by defendants; thence north through the lands of defendants in a ravine which extended to Round Lake. It was the further claim that it was only after a hard rain or in the spring and fall that water was found in the ravine north of the county line road.

It is the claim of the complainants that the route indicated was the route of the surface water in a state of nature, and that, as Fourth street, Third street, First street, and the county line road were opened, the ravine was first bridged, and later crock tiles were put in to permit the passage of the water, and that for the same purpose an opening was left under the railroad when it was constructed. The testimony indicates that the village of Sand Lake has not grown very much for a long time. It is also the claim that the surface water from the south side of Lake street and that part of the village south thereof found its way south and east into a county drain.

In 1907 the defendants bought a small piece of land

in the village east of First street, and south and adjoining the county line road, and a much larger piece north of the county line and extending from the county line to Round Lake. In the same year they purchased the land they commenced the erection of a house on the bluff a few rods away from the lake, and it is claimed they have invested, including the value of their work, about $4,000.

Shortly before the bill of complaint in this case was filed, defendants drew 15 or 20 loads of earth and dumped it into and across the ravine on their land in the village just adjoining First street. This made a dam, variously estimated as 1½ to 2½ feet high. On the west part of Mr. Giddings' land there was a low place where the water sometimes stood, and especially during the winter season, so that persons so inclined could skate thereon. This depression is called by some of the witnesses, and by counsel for defendants, Giddings pond. Just west of the railroad opposite Mr. Giddings' land Mr. Blanchard owned land which was low, and at times water would stand there.

It was the claim of complainants that, as the result of the action of the defendants, the surface water was backed upon and across the Giddings land, upon and across Third street, upon and across the railroad right of way, upon and across Fourth street, and upon the low land of Mr. Blanchard, and became stagnant water and a menace to the health of the citizens of the village.

It was the claim of the defendants that by reason of putting in cement gutters on Lake street, the building of some new buildings, deepening ditches and putting in crock tiles that more water came to them than would naturally come, and that the water had become polluted so as to make a stench in and about their house near Round Lake, and that the conditions were so bad that Mrs. Allen became ill, and that they were justified in doing what they did.

The complainants denied that the volume of water had increased, and denied that it had become polluted, and insist that, if there was any stench about the house of defendant, it could be accounted for in another and much more reasonable way.

The case was heard in open court. After the hearing had been in progress some time, the trial judge suggested to counsel:

"Now, there is no question about the fact that at least from the point of intersection between Lake street and Fourth street the general lay of the land is toward the northeast, and that the natural course of the water reaching that point at least would be in the direction indicated. That is not the question, though. Assuming that that is the natural lay of the land, the real question involved here is, under the answer and the claims made by the defendants, as to whether anything more than water is permitted to go down over the land of the defendants detrimental to public health, or to the health of the defendants; in other words, whether the servient estate is bound to receive anything more from the dominant estate than nature places upon the dominant estate in the way of water. The general rule is, as we all know, that water arising upon a dominant or upper estate can pass over the servient or lower estate, and that this right is an easement so denominated in the law. But it is also equally well settled that the dominant estate cannot add to this easement or right; that is, cannot claim a privilege additional to the natural right to have the water from the upper flow down over and across the lower estate. So the question here is as to whether the claims of the defendants are true. Has there been anything added to this flow which does not by nature, or did not by nature, exist? If any filth or additional water from whatever source is permitted to flow into this natural course and down and upon the defendants' land, that ends it. If all that goes from this village down onto this land is that which by nature should be permitted to go there, that also ends it. Now, that is the issue, and the sole issue, in this case. It would be strange that any other rule could be tolerated or permitted; in fact, it is not in

the law permitted.   *   *   *   I speak now because I know that you are, as well as I, anxious to complete this case, and that is the only issue involved.   If the complainants can show to the court that the water which is permitted to run down over the defendants' land is water which naturally rises upon a dominant estate, and runs down there in an unpolluted state, they can recover; they are entitled to a permanent injunction to restrain the defendant from interfering with the natural progress of the water."

"On the other hand, if the defendant satisfies the court that the water thrown down on their estate is not in the natural state, but is polluted, and that additional water is permitted to flow down which does not arrive in a natural state, why, the defendants must prevail.   Now, that is the law and all that is involved in this case."

"*Mr. Herman:* The court does not expect the complainant to prove that the water was polluted?

"*The Court:* No; I expect you to prove it was not, and that is why I suggested the burden is upon you to show it was not."

After this suggestion was made the hearing continued at great length, and the court granted the injunctive relief prayed for in the bill of complaint. The case comes here by appeal.

The law which should control in a dispute of this nature is not in doubt in this State.   Some of the cases in which it is declared are:   *Fox* v. *Holcomb*, 32 Mich. 494; *Upjohn* v. *Richmond*, 46 Mich. 542 (9 N. W. 845, 41 Am. Rep. 178) ; *People* v. *Hulbert*, 131 Mich. 156 (91 N. W. 211, 64 L. R. A. 265, 100 Am. St. Rep. 588) ; *Tower* v. *Township of Somerset*, 143 Mich. 195 (106 N. W. 874) ; *Phillips* v. *Armada*, 155 Mich. 260, 263 (118 N. W. 941) ; *Smith* v. *Barrett*, 159 Mich. 325 (123 N. W. 1091) ; *Village of Trenton* v. *Rucker*, 162 Mich. 19 (127 N. W. 39, 34 L. R. A. [N. S.] 569) ; *Wyoming Township* v. *City of Grand Rapids*, 175 Mich. 503 (141 N. W. 890).

The question involved is one of fact.   Counsel for

the appellant in their oral arguments, and in their printed briefs, were and are so earnest in their contention that a great injustice was done their clients by the decree in the court below, that we have read with great care all the evidence contained in the very voluminous record before us. We have not overlooked what is claimed by counsel for the analysis of three samples of water by the State bacteriologist, sent to him by the defendants. This analysis would have much more value for the defendants if the water had been taken from their premises, instead of through a hole in the ice in Giddings pond, and from a pool in Fourth street, and the so-called Blanchard pond, all of which were 40 or 50 rods away from the residence of defendants.

The following, taken from the letter accompanying the analysis, is illuminating:

"These three samples were brought to the laboratory by Mr. Henkel, who claimed that they represented wastes that the city was discharging into a lake. The question was whether or not this material would dangerously contaminate the water. We informed him that this question could not be answered without a thorough inspection of the local conditions as much would depend upon the amount of discharge and size, as well as other conditions."

We have also given due heed to the argument of counsel about the changed conditions caused by the construction of the cement gutter on Lake street, the construction of the four-flat building, and the conditions in the meat market. A careful reading of the record does not sustain the inferences of counsel.

A large number of witnesses were sworn. Some of the testimony is in conflict. Some of it is not true. A careful reading of all of it satisfies us not only that defendants have failed to establish their defense, but that complainants have met the onus put upon them by the chancellor. In reaching this conclusion we do

not need to invoke the rule that the chancellor has an advantage over this court because he sees and hears the witnesses.

The decree is affirmed, with costs.

BROOKE, C. J., and MCALVAY, KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.