RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0247p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DAVID A. HERR; PAMELA F. HERR,

                    *Plaintiffs-Appellants,*

v.

UNITED STATES FOREST SERVICE, et al.,

                    *Defendants-Appellees,*

SWC, LLC, et al.,

                    *Intervenors.*

No. 14-2381

_____

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 2:14-cv-00105—R. Allan Edgar, District Judge.

Argued: August 4, 2015

Decided and Filed: October 9, 2015

Before: SUTTON and DONALD, Circuit Judges; ZOUHARY, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Steven J. Lechner, MOUNTAIN STATES LEGAL FOUNDATION, Lakewood, Colorado, for Appellants. Mark R. Haag, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. Jennifer E. Tarr, ENVIRONMENTAL LAW & POLICY CENTER, Chicago, Illinois, for Intervenors. **ON BRIEF:** Steven J. Lechner, MOUNTAIN STATES LEGAL FOUNDATION, Lakewood, Colorado, for Appellants. Mark R. Haag, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. Jennifer E. Tarr, Howard A. Learner, ENVIRONMENTAL LAW & POLICY CENTER, Chicago, Illinois, Robert L. Graham, Chicago, Illinois, for Intervenors.

_____

[*]The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

1

—————————

**OPINION**

—————————

SUTTON, Circuit Judge.  David and Pamela Herr bought waterfront property on Crooked Lake in the Upper Peninsula of Michigan and planned to use their gas-powered motorboat on it. That plan was dashed when the U.S. Forest Service threatened to enforce a regulation that bans non-electric motorboats from the ninety-five percent of the lake that falls within a National Wilderness Area.  The Herrs responded with this lawsuit, seeking to enjoin enforcement of the regulation on the ground that the relevant federal statute preserves their state-law property right to use all of the lake.  The district court held that a six-year time bar on the action was jurisdictional and that the Herrs had waited too long to file this lawsuit.  We reverse based in large part on a Supreme Court decision handed down after the district court's decision. *See United States v. Kwai Fun Wong*, 135 S. Ct. 1625 (2015).

I.

Nestled in old-growth forest 120 miles from Marquette, Crooked Lake is three miles long and is one of thirty-six interconnected glacial lakes that offer all manner of activities for those who appreciate the outdoors.  Most of Crooked Lake rests in the federally protected Sylvania Wilderness Area, which the U.S. Forest Service oversees under the Michigan Wilderness Act of 1987, 101 Stat. 1274.  A National Wilderness Area like Sylvania "preserv[es] the wilderness character of [an] area" by minimizing human impact.  16 U.S.C. § 1133(b).  One way the Act advances this goal is by prohibiting motorized vehicles in the area except those permitted by the Forest Service. *Id.* § 1133(c), (d)(1).

That rule would seem to bar gas-powered motorboats from Crooked Lake, and for the most part that is true. *See* 36 C.F.R. § 293.6.  But a sliver of the lake—the northern part of the northernmost bay—falls outside the Sylvania Wilderness and thus beyond the Forest Service's reach.  On the northern shore of that bay sits the only private property on Crooked Lake: approximately ten privately owned lots.  For some time, the owners have used gas-powered motorboats on the lake's waters.

No one protests the use of these motorboats on the part of the lake outside the wilderness. But inside the protected zone, the Forest Service says, the landowners, like the general public, must abide by all restrictions on motorized boats. One restriction, found in the Forest Service's 2006 forest-management plan for the Sylvania Wilderness, bans motorboats from the wilderness portion of Crooked Lake except for those powered by electric motors with less than four horsepower. U.S. Forest Serv., *Final Environmental Impact Statement for 2006 Ottawa National Forest Plan* 3-48 (2006). The agency may punish violations of the requirement with a fine of up to $5,000 or a prison sentence of up to six months (or both). *See* 16 U.S.C. § 551; 18 U.S.C. §§ 3559(a)(7), 3571(b)(6).

When this restriction went into effect, David and Pamela Herr, a married couple, were occasional visitors to Crooked Lake, having vacationed there at various times since 1979. In September 2010, they became landowners, buying two of Crooked Lake's waterfront lots. One reason the couple bought the property was to "use gas-powered motorboats" on the lake. R. 4 at 11. That would not pose a problem, the seller said, because he had boated "on the entire surface of Crooked Lake without hindrance by the Forest Service." *Id.*

At first no problems arose after the Herrs bought the property. "Each summer from 2010–2012," the couple bought "a pass from the Forest Service . . . to use the Forest Service boat landing on Crooked Lake" as lake access for "their gas-powered motorboat." *Id.* They used "the entire surface of Crooked Lake" during that time, and the Forest Service never stopped them. *Id.*

Things changed in 2013. The Forest Service informed the Herrs by letter that local "Forest Service personnel [would start] fully enforc[ing]" the motorboat restrictions against them (and others) "within the wilderness portion of Crooked Lake." R. 4-5 at 2. Until this letter, so far as the pleadings show, the Forest Service had not enforced the 2007 forest order against private landowners.

In May 2014, the Herrs filed this lawsuit under the Administrative Procedure Act to enjoin the Forest Service from enforcing the motorboat restriction against them. *See* 5 U.S.C. § 702. Their lawsuit turned on two legal premises—one state, one federal. Under state law, lakefront real estate owners have a property right to use the *entire* surface of the lake for boating and sailing. *People v. Hulbert*, 91 N.W. 211, 211–12, 218 (Mich. 1902). Under federal law, the

Forest Service's authority over Crooked Lake is "[s]ubject to valid existing rights." Michigan Wilderness Act, § 5, 101 Stat. 1274, 1275; *see* 36 C.F.R. § 293.3. Two environmental organizations and two other Crooked Lake property owners intervened to support the Forest Service. The private-party intervenors hope to preserve the peace and quiet of the area's "[p]ristine glacial lakes"—with their accompanying "world-class smallmouth bass fisheries," R. 15-1 at 1, often accessed by canoes, kayaks, or boats that run on small electric-powered motors. The district court dismissed the Herrs' 2014 complaint for lack of jurisdiction, reasoning that the limitations period governing this action was jurisdictional, that the six-year limitations clock started when the Forest Service issued the relevant order in 2007, and that the limitations period ended in 2013—one year before they filed the lawsuit.

## II.

The Herrs' appeal raises two questions: (1) Does the statute of limitations (28 U.S.C. § 2401(a)) impose a jurisdictional barrier on the power of the federal courts to hear this case? And (2) did the six-year limitations period run before they filed this lawsuit?

## A.

*Jurisdiction.* For the last decade, the Supreme Court has been on a mission to reign in profligate uses of "jurisdiction," a word with "many, too many, meanings." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006). The meaning that counts here, and the one the Court has become disciplined about distinguishing from others, is subject-matter jurisdiction. Properly understood, subject-matter jurisdiction turns on whether a federal court has "statutory or constitutional *power* to adjudicate the case" before it. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). The stakes of the inquiry are high. In the absence of subject-matter jurisdiction, a federal court must dismiss the lawsuit—no matter how far along the litigation has progressed (including to the last-available appeal), no matter whether the parties forfeited the issue, no matter indeed whether the parties have waived it. *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434–35 (2011); *see* Fed. R. Civ. P. 12(h)(3). That is strong medicine for litigants, attorneys, and judges alike. Before the courts will assume that Congress has imposed such a limit on its power, they require the legislature to "clearly state[]" that a given statute implicates the judiciary's subject-matter jurisdiction. *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S.

Ct. 817, 824 (2013); *see also, e.g., Henderson*, 562 U.S. at 435–36; *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161–62 (2010); *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs, Cent. Region*, 558 U.S. 67, 81 (2009). Our court has picked up on the message. *See Brentwood at Hobart v. NLRB*, 675 F.3d 999, 1002–04 (6th Cir. 2012); *Hoogerheide v. IRS*, 637 F.3d 634, 636 (6th Cir. 2011).

*Kwai Fun Wong*, decided *after* the district court's decision in this case, applied this clear-statement rule to a neighboring statute of limitations that, like § 2401(a), governs lawsuits against the federal government. *See* 28 U.S.C. § 2401(b). Here is what that statute says: "A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented." *Id.* Deploying "traditional tools of statutory construction," the Court concluded that § 2401(b) was not jurisdictional. *Kwai Fun Wong*, 135 S. Ct. at 1632. The statute's text "does not speak in jurisdictional terms," the Court noted, "or refer in any way to the jurisdiction of the district courts." *Id.* at 1633. It merely "say[s] only what every time bar, by definition, must: that after a certain time a claim is barred." *Id.* at 1632. The Court also observed that, when Congress enacted § 2401(b) as part of the Federal Tort Claims Act, it placed the Act's jurisdictional provisions apart from the statute of limitations. *Id.* at 1633. "Congress's separation of a filing deadline from a jurisdictional grant indicates that the time bar is not jurisdictional." *Id.* *Kwai Fun Wong* acknowledged that § 2401(b)'s "language is mandatory" but found that of "no consequence," as statutes of limitations frequently speak in mandatory terms. *Id.* at 1632.

In ruling that the statute of limitations in § 2401(b) does not erect a non-forfeitable (and non-waivable) jurisdictional bar, *Kwai Fun Wong* removes some of the suspense from this appeal. Section 2401(a), the subsection at issue today, says that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." That language, like the language in § 2401(b), most naturally relates to how and when to process a claim, not the power of the court. The statute does not "speak in jurisdictional terms." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982).

It "reads like an ordinary, run-of-the-mill statute of limitations, spelling out a litigant's filing obligations without restricting a court's authority." *Kwai Fun Wong*, 135 S. Ct. at 1633 (quotations omitted). For these reasons, the Court concluded, § 2401(b) does not contain a clear statement limiting subject-matter jurisdiction.

It is tempting to leave it at that. If *Kwai Fun Wong* establishes that § 2401(b) does not establish a jurisdictional bar on our power, then it would seem that the similarly worded § 2401(a) does not do so either. Although *Kwai Fun Wong* removes some of the suspense from this appeal, however, it does not remove all of it.

The apparent contextual clue suggested by the sibling pairing of these statutes of limitations is misleading. The codification of two provisions next to each other does not necessarily mean that they were enacted together or for that matter that they share common roots. In this instance, subsection (b) comes from the Federal Tort Claims Act, § 420, 60 Stat. 812, 845 (1946), while subsection (a) comes from the Tucker Act, § 1, 24 Stat. 505, 505 (1887). The potential inference created by the codified pairing thus is not a real inference. We do not "infer[] that Congress, in revising and consolidating the laws, intended to change their effect, unless such intention is clearly expressed." *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 227 & n.8 (1957); *cf. Wachovia Bank v. Schmidt*, 546 U.S. 303, 314–15 (2006). Section 2401 contains no such indication. Even so, that does not alter our ultimate conclusion. It means only that a potential *additional* reason for treating subsection (b) as non-jurisdictional does not exist. That does not undermine the many other ways in which the Court's cases, including *Kwai Fun Wong*, indicate that this statute of limitations does not limit our jurisdiction over this case.

One other complication requires a longer (a few pages longer) digression, covering the history of the Big and Little Tucker Acts, two other Supreme Court decisions, and the role of stare decisis. First the history. In 1887, Congress passed the Tucker Act, which waived some of the federal government's sovereign immunity, authorizing a range of private-party lawsuits against the government for money damages and other relief. Tucker Act, §§ 1–2, 24 Stat. at 505; *see Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999). Before then, Congress had permitted only a few money-damages lawsuits against the federal government, all in the Court of Claims. *See* Act of Mar. 3, 1863, § 2, 12 Stat. 765, 765; *Langford v. United States*, 101 U.S.

341, 343–44 (1879). And those lawsuits had been governed by an 1863 statute of limitations, which provided that "every claim against the United States . . . shall be forever barred unless" filed "within six years after the claim first accrues." Act of Mar. 3, 1863, § 10, 12 Stat. at 767.

The Tucker Act expanded the federal courts' jurisdiction over money-damages lawsuits against the federal government in two ways. A provision now known as the Big Tucker Act enlarged the Court of Claims' jurisdiction. *See* Tucker Act, § 1, 24 Stat. at 505; *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part). And a provision now called the Little Tucker Act authorized the district and circuit courts to hear any lawsuit that could be brought in the Court of Claims as long as the amount in controversy did not exceed $10,000. *See* Tucker Act, § 2, 24 Stat. at 505; *United States v. Bormes*, 133 S. Ct. 12, 15 (2012). Governing both provisions, Big and Little, was a new six-year statute of limitations, which provided that "no suit against the Government of the United States, shall be allowed under this act unless the same shall have been brought within six years after the right accrued for which the claim is made." Tucker Act, § 1, 24 Stat. at 505. This 1887 provision did not repeal the 1863 statute of limitations, meaning that both laws governed lawsuits in the Court of Claims unless they were "absolutely irreconcilable." *United States v. Greathouse*, 166 U.S. 601, 605 (1897).

In 1911, Congress reorganized several statutes regulating federal-court procedure. Act of Mar. 3, 1911, 36 Stat. 1087. In the process, it created new, separate statutes of limitations for the Big and Little Tucker Acts. For the Big Tucker Act, Congress used the language from the 1863 Court of Claims statute of limitations. *See id.* § 156, 36 Stat. at 1139. For the Little Tucker Act, Congress used the language from the 1887 statute of limitations. *See id.* § 24(20), 36 Stat. at 1093. Congress moved the Big Tucker Act's limitations provision to its current home (28 U.S.C. § 2501) in 1948. It moved the Little Tucker Act's limitations provision, the one at issue today, to its current home (28 U.S.C. § 2401(a)) at the same time.

To the Forest Service, this history shows that § 2401(a) limits subject-matter jurisdiction. The thinking goes like this. In *United States v. Sherwood*, 312 U.S. 584, 591 (1941), the Court noted in dicta that the "jurisdiction of district courts" under the Little Tucker Act is "as restricted as is that of the Court of Claims" under the Big Tucker Act. And in *John R. Sand & Gravel Co.*

*v. United States*, 552 U.S. 130, 134 (2008), the Court held that the Big Tucker Act's statute of limitations (§ 2501) is jurisdictional because a prior decision (*Kendall v. United States*, 107 U.S. 123 (1883)) had held that § 2501's predecessor, the 1863 statute of limitations for the Court of Claims, limits the Court of Claims' subject-matter jurisdiction. The force of stare decisis, *John R. Sand* held, allowed § 2501 to remain jurisdictional despite the prevailing current in the caselaw that time bars do not create jurisdictional bars. 522 U.S. at 138–39. All of this, says the Forest Service, means that the Little Tucker Act's limitations period (§ 2401(a)) also deprives the federal district courts of subject-matter jurisdiction over claims more than six years old.

The key link is *John R. Sand*, and it does not provide the necessary foundation for this argument. The decision does not establish that other statutes of limitations sharing language and features of the *John R. Sand* statute of limitations must be treated as jurisdictional on stare decisis grounds. Otherwise, several cases resolved during the Court's ten-year push to straighten this area out would have come out differently. To use the most salient example, *John R. Sand* held that a limitations statute saying that late claims against the United States "shall be barred" created a jurisdictional limitation. 28 U.S.C. § 2501. But *Kwai Fun Wong* held that a statute saying late claims against the United States "shall be forever barred" did not create a jurisdictional limitation. 28 U.S.C. § 2401(b). *John R. Sand* thus must mean something else.

The decision stands only for the modest proposition that, if the Court has already definitively interpreted a statute (there § 2501 or its predecessor) to erect a jurisdictional bar, it would respect that holding in future cases on stare decisis grounds. That indeed is how the Court distinguished *Irwin v. Department of Veterans Affairs*, 498 U.S. 89 (1990), which considered a similarly worded statute. "*Irwin*," the Court remarked, "dealt with a different limitations statute. That statute, while similar to the present statute in language, is unlike [§ 2501] in the key respect that the Court had not previously provided a definitive interpretation." 552 U.S. at 137. *John R. Sand*'s own accounting of itself makes it a ticket good for one destination and one destination alone: § 2501. And that explanation does not help the Forest Service because today's statute, like the one at issue in *Irwin*, is not § 2501. We know of no Supreme Court cases holding that § 2401(a) (or its predecessor) is jurisdictional or that § 2401(a) must be interpreted like § 2501. Respect for precedent justifies *John R. Sand*, but that is all.

A critical feature of stare decisis—perhaps the salient feature of it—is that it requires courts to preserve error. All three explanations for the doctrine—stability, predictability, and ease of judicial administration—have work to do in preserving mistakes. Only the last one—allowing judges to work less hard—plays a role when it comes to correctly decided prior decisions. Much as these explanations may justify the doctrine in both settings, they disappear when parties seek to *extend* precedent—especially flawed precedent. Stare decisis may require courts to give respect to prior mistaken decisions. It may even require courts to cover prior mistakes with bubble wrap and lock them in safe places. But it does not require courts to extend them.

What of the fact that § 2401(a) has roots in the Little Tucker Act, § 2501 has roots in the Big Tucker Act, and the statutes of limitations for both were once coextensive? This historical excursion does not present the full picture. Congress altered the Little Tucker Act's statute of limitations—the one at issue here—in 1948. It separated the Little Tucker Act's limitations period and jurisdictional grant into sections. *Compare* 28 U.S.C § 41(20) (1940), *with* Act of June 25, 1948, §§ 1346, 2401(a), 62 Stat. 869, 933, 971. And it broadened the Little Tucker Act's statute of limitations. It now governs "*every* civil action commenced against the United States," 28 U.S.C. § 2401(a) (emphasis added), while the prior version governed only actions seeking money damages "not exceeding $10,000," 28 U.S.C. § 41(20) (1940). Congress thus extended the Little Tucker Act's statute of limitations beyond small money-damages actions. *See, e.g., Walters v. Sec'y of Def.*, 725 F.2d 107, 113–14 (D.C. Cir. 1983); *Werner v. United States*, 188 F.2d 266, 268 (9th Cir. 1951). This change, when combined with Congress's decision to separate the Little Tucker Act's statute of limitations from the jurisdictional grant, demonstrates that § 2401(a) was designed to serve as a standard, mine-run statute of limitations without jurisdictional qualities. That leaves us with a statute (§ 2401(a)) that does not clearly impose a jurisdictional limit.

What of the canon that directs courts to construe waivers of sovereign immunity narrowly? Does that trump the canon that insists on a clear statement before courts will treat limitations on causes of action as jurisdictional? *Kwai Fun Wong* (and *Irwin* before it) rejected the same argument. The Court in both cases "declined to count time bars as jurisdictional merely

because they condition waivers of immunity." *Kwai Fun Wong*, 135 S. Ct. at 1637. It instead treated them as it would any other statute of limitations. So do we.

Regardless, the Forest Service responds, *McDonald v. Resor*, 34 F.3d 1068, at *2 (6th Cir. 1994) (unpublished order), indicates that § 2401(a) "is a condition of federal court jurisdiction." That is a stretch. *Resor* is a nonprecedential case. It made the point only in dicta. It provided no analysis to support the point. It predates *Arbaugh* and the other cases designed to clean up this area. And it relied on a case discussing § 2501, not § 2401(a), for this proposition. To the extent we wish to consider dicta from pre-*Arbaugh* cases, we would pick a published case going the other way. *See United States v. Knott*, 69 F.2d 907, 910–11 (6th Cir. 1934).

After today's decision, it is true, there is a 4–3 circuit split on the point, with four of the circuits favoring the government's position that § 2401(a) creates a jurisdictional bar. *Compare Konecny v. United States*, 388 F.2d 59, 61–62 (8th Cir. 1967); *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006) (per curiam); *Mendoza v. Perez*, 754 F.3d 1002, 1018 (D.C. Cir. 2014); *and Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576–77 (Fed. Cir. 1988), *with Clymore v. United States*, 217 F.3d 370, 374 (5th Cir. 2000); *Herr v. U.S. Forest Serv.*, No. 14-2381 (6th Cir. Oct. 9, 2015); *and Cedars-Sinai Med. Ctr. v. Shalala*, 125 F.3d 765, 770 (9th Cir. 1997). Many of these cases, however, have not grappled with the Supreme Court's recent cases limiting the concept of jurisdiction. None has considered the impact of *Kwai Fun Wong*, decided just this year. When the D.C. Circuit has noted the apparent conflict between its decision and the *Arbaugh* line of cases, it has acknowledged the point each time yet steered the basis for decision to other grounds. *See Mendoza*, 754 F.3d at 1018 n.11; *P & V Enters. v. U.S. Army Corps of Eng'rs*, 516 F.3d 1021, 1026–27 & n.2 (D.C. Cir. 2008); *Felter v. Kempthorne*, 473 F.3d 1255, 1260 (D.C. Cir. 2007); *Harris v. FAA*, 353 F.3d 1006, 1013 n.7 (D.C. Cir. 2004). The *Arbaugh* rule together with its application in *Kwai Fun Wong* gives us comfort in siding with the non-jurisdictional side of this split. Section 2401(a) does not limit a federal court's subject-matter jurisdiction.

B.

*Statute of limitations.*   That a limitations period is not jurisdictional does not mean it is not mandatory.   We must determine (1) whether the Herrs filed this claim within the limitations period and if not (2) whether they are entitled to equitable tolling.

Here is the timeline:  The Herrs rented property on the lake at various times since 1979; the agency rule at issue went into effect in 2007; the Herrs bought their lakefront property in 2010; and they filed this lawsuit in 2014.   The statute creates a six-year limitations period, making the start of the six-year clock the dispositive issue.   If the time period began running in 2007 when the Forest Service promulgated this regulation, the statute required the Herrs to file the lawsuit within the next six years—by 2013.   If the time period began running when they purchased their property, this 2014 lawsuit comes well within the six-year limitations period.

The limitations period in § 2401(a) begins to run when a party's "right of action first accrues"—"as soon as (but not before) the person challenging the agency action can institute and maintain a suit in court," *Spannaus v. DOJ*, 824 F.2d 52, 56 (D.C. Cir. 1987).   This comports with the general rule that "a statute of limitations begins to run . . . when the plaintiff can file suit and obtain relief," *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 134 S. Ct. 604, 610 (2013) (quotations omitted), for "the injury upon which [his] action is based," *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009).

To file a lawsuit under the Administrative Procedure Act, parties must satisfy two requirements.  They must know or have reason to know that the challenged agency action caused them to suffer a "legal wrong" or "adversely affected or aggrieved" them "within the meaning of a relevant statute."  5 U.S.C. § 702; *see Stupak-Thrall v. Glickman*, 346 F.3d 579, 584 (6th Cir. 2003).   And the challenged agency action must be "final," 5 U.S.C. § 704, "determin[ing] rights or obligations" and "mark[ing] the consummation of the agency's decisionmaking process," *Sackett v. EPA*, 132 S. Ct. 1367, 1371–72 (2012).   Once the challenged agency action becomes final and invades a party's legally protected interest, the party's right to redress that injury under the APA accrues, *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882–83 (1990), and § 2401(a)'s six-year clock starts ticking.

In their complaint, the Herrs allege that the Forest Service's 2007 forest order invaded their state-law property right to use their gas-powered motorboat on all of Crooked Lake, a right that section 5 of the Michigan Wilderness Act protects. Both parties agree that the 2007 forest order constitutes final agency action. And both appear to agree that the deprivation of a property right would "aggrieve[]" the Herrs "within the meaning of" section 5, a provision that protects private property rights from abrogation by the Forest Service. *See* 5 U.S.C. § 702. When, then, did the forest order abridge the Herrs' alleged property right?

September 2010. That is when the Herrs purchased their waterfront property on Crooked Lake. The Herrs allege that their property right "to use the entire surface" of Crooked Lake "ar[ose], by operation of [Michigan] law, as an incident to [their] ownership of property adjoining the banks" of the lake. R. 4 at 5. If that is correct, they had no property right to use all of Crooked Lake until they owned lots abutting the lake. The Herrs thus could not have become "aggrieved" by the Forest Service's invasion of that property right until they became property owners on the lake—until they purchased their waterfront real estate in September 2010. Only at that point could the Herrs meet both requirements to bring this lawsuit under the APA by pleading final agency action *and* an injury to their rights under the Michigan Wilderness Act. Only at that point did their "right of action" under the APA "accrue[]." 28 U.S.C. § 2401(a). And only at that point did the six-year limitations period begin to run. The Herrs thus had until September 2016 to challenge the Forest Service's gas-powered boat restriction, a deadline they met by more than two years.

The Forest Service tries to counter this conclusion in several ways. It argues that a right of action under the APA accrues upon final agency action regardless of whether that action aggrieved the plaintiff. But that contradicts the text of the statute and Supreme Court precedent to boot. Only "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702 says, "is entitled to judicial review thereof." If a party cannot plead a "legal wrong" or an "adverse[] [e]ffect[]," *id.*, it has no right of action. *See, e.g., Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012); *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970); *see also Lexmark Int'l, Inc. v. Static Control*

*Components, Inc.*, 134 S. Ct. 1377, 1387 nn.3–4 (2014).  No doubt, the party must *also* plead final agency action, *see* 5 U.S.C. § 704, but that is another necessary, but not by itself a sufficient, ground for stating a claim under the APA.

Some courts, it is true, have suggested that an APA claim "first accrues on the date of the final agency action."  *Hardin v. Jackson*, 625 F.3d 739, 743 (D.C. Cir. 2010); *see, e.g., Latin Ams. for Soc. & Econ. Dev. v. Adm'r of the Fed. Highway Admin.*, 756 F.3d 447, 464 (6th Cir. 2014).  But these cases show why we don't read precedents like statutes.  These cases all involved settings in which the right of action happened to accrue at the same time that final agency action occurred, because the plaintiff either became aggrieved at that time or had already been injured.  A classic example would be an agency that issues a rule without following all requirements of notice-and-comment rulemaking.  *See* 5 U.S.C. § 553(c).  This denial of process to the public at large violates the statute, and any party concretely injured by the action (say, a party who has to pay a fee because of the rule) may sue to correct that wrong.  The clock for the injured party begins to tick the moment the agency took its final action because the agency's lack of notice-and-comment rulemaking already legally injured the party.  But that is not the case when, as here, the party does not suffer any injury until *after* the agency's final action.  *See Wind River Mining Corp. v. United States*, 946 F.2d 710, 714–16 (9th Cir. 1991).

*Southwest Williamson County Community Ass'n v. Slater*, 173 F.3d 1033 (6th Cir. 1999), is not to the contrary.  It held that the limitations period for challenging an agency's environmental assessments started to run when final agency action occurred even though the plaintiff-association did not come into existence until later.  *Id.* at 1036.  The reason, however, is that the association did not allege harms to *itself* as an organization, *cf. Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); it sought relief on behalf of its members, *see Sierra Club v. Morton*, 405 U.S. 727, 739 (1972); *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 704 n.7 (D.C. Cir. 1988).  Nothing in the case suggests that any member first became aggrieved after, rather than when, final agency action occurred.

Even if a claimant needs to suffer an injury to bring an APA challenge, the Forest Service maintains that the Herrs sustained an injury when it issued the order in 2007.  Because the Herrs have boated on Crooked Lake since the late 1970s through vacation rentals, the Service argues,

they had a recreational interest that the 2007 forest order infringed. Yes and no. Yes, the boating restriction harmed the couple's recreational interests in 2007 and perhaps might have given them *a* right of action under the APA at that time. But no, *this* right of action did not accrue at that time. A "right of action," as understood when Congress enacted 28 U.S.C. § 2401(a), is "a legal right to maintain an action, growing out of a *given transaction or state of facts and based thereon*." *Black's Law Dictionary* 1560 (3d ed. 1933) (emphasis added); *see* Act of June 25, 1948, § 2401(a), Pub. L. No. 80-773, 62 Stat. 869, 971. Such a right arises from a fact pattern that demonstrates a specific "legal wrong"—"an act authoritatively prohibited by a rule of law." *Black's Law Dictionary* 1849 (10th ed. 2014); *see* 1A C.J.S. *Actions* §§ 54, 55; 1 Am. Jur. 2d *Actions* §§ 1, 2; *see also McMahon v. United States*, 186 F.2d 227, 230 (3d Cir. 1950), *aff'd*, 342 U.S. 25 (1951).

Different legal wrongs give rise to different rights of action. *See Am. Fire & Cas. Co. v. Finn*, 341 U.S. 6, 13 (1951); *Baltimore S.S. Co. v. Phillips*, 274 U.S. 316, 321 (1927); *Union Pac. Ry. Co. v. Wyler*, 158 U.S. 285, 291–92 (1895). That is so even if the different *legal* wrongs stem from the same order. *See* 1A C.J.S. *Actions* § 189; 1 Am. Jur. 2d *Actions* § 76. The upshot is this: Even if the Herrs had *some* right of action to remedy *some* legal wrong related to their recreational interests in 2007, they could not have had *this* right of action to remedy *this* legal wrong—the infringement of a property right in violation of the Michigan Wilderness Act—until they obtained that property right in 2010.

The Forest Service also looks to the Herrs' predecessor in interest, the prior owner of the lakefront lots, to defeat this lawsuit. The prior owner held title to the property in 2007, which means that his right of action to challenge the boating restriction as infringing his property rights arose in 2007. The Herrs, the theory goes, do not have their own independent right of action; their right stems from the one that accrued to the lots' prior owner in 2007, which "ran with the land" after the 2010 sale. That right of action expired in 2013, the theory continues, making this action late all the same.

Property law says otherwise. Once a right of action accrues, it becomes a "piece" of intangible personal property called a "chose in action." *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 275 (2008). Choses of action to enforce property rights do not, as a general

matter, automatically transfer when the underlying property changes hands.  *See, e.g., Peters v. Bowman*, 98 U.S. 56, 58–59 (1878) (right to enforce covenant does not run with land); *Ginsberg v. Austin*, 968 F.2d 1198, 1201 (Fed. Cir. 1992) (right to recover outstanding rent payments does not run with land); *In re Nucorp Energy Sec. Litig.*, 772 F.2d 1486, 1490 (9th Cir. 1985) (right of action under Rule 10b-5 does not automatically transfer when security is sold); *see also Restatement (Second) of Contracts* § 317 (1981); *Restatement (First) of Property* § 552 (1944).  No doubt, one may *assign* a chose in action to another party, *see Sprint*, 554 U.S. at 275–77, but that requires the assignor to "manifest an intention to transfer the right" to the assignee, *Restatement (Second) of Contracts, supra*, § 324; *see Restatement (First) of Property, supra*, § 552 cmt. c.  No such intention appears in this record.  The Herrs' deed says only that they acquired the "premises" of their lots from the prior owner.  R. 4-1 at 2.

Nor does § 2401(a) alter this conclusion.  The statute contains no language suggesting that the limitations period starts when a plaintiff's predecessor in interest could first file a lawsuit.  Congress knew how to impose such a limitation.  It has done so before.  In the Quiet Title Act, it barred any civil action unless "commenced within twelve years of the date . . . the plaintiff *or his predecessor in interest* knew or should have known of the claim of the United States."  28 U.S.C. § 2409a(g) (emphasis added).  Section 2401(a) contains no such statement, and "[w]e do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply."  *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 341 (2005).

If the transfer of property alone permits new APA challenges arising from ownership of that property, the Service warns, agency regulations will never be safe from attack.  That is not true in one sense.  As just shown, Congress knows how to make statutes of limitations run against current owners and "predecessors in interest."  It simply chose not to do so here.

That argues much too much in another sense.  A federal regulation that makes it six years without being contested does not enter a promised land free from legal challenge.  Regulated parties may always assail a regulation as exceeding the agency's statutory authority in enforcement proceedings against them.  *See NLRB Union v. Fed. Labor Relations Auth.*, 834 F.2d 191, 195 (D.C. Cir. 1987); *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir.

1958); *see also Wind River*, 946 F.2d at 714 (collecting cases). That is true of old and new regulations. *See Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2424–25 (2015) (regulatory regime dating back to 1937); *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 163 (2007) (regulation promulgated in 1975). Recall that the Forest Service has threatened criminal action against the Herrs. Does anyone really think that the Herrs would not be allowed to challenge the Forest Service's administrative authority to put them in jail for six months or fine them $5,000 based on its interpretation of this statute? *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *cf. Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 729–36 (6th Cir. 2013) (Sutton, J., concurring). That is a steep climb. Any such theory of repose is a mirage in still another sense. Regulated parties may always petition an agency to reconsider a longstanding rule and then appeal the denial of that petition (as the denial counts as final agency action). 5 U.S.C. § 553(e); *see NLRB Union*, 834 F.2d at 195.

Our decision adds only a modest wrinkle to this regime. When a party *first* becomes aggrieved by a regulation that exceeds an agency's statutory authority more than six years after the regulation was promulgated, that party may challenge the regulation without waiting for enforcement proceedings. That makes sense, as courts "normally do not require plaintiffs to bet the farm . . . by taking the violative action before testing the validity of the law." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 490–91 (2010) (quotations omitted).

Even if the Herrs filed their complaint within § 2401(a)'s time limits, the Forest Service contends that they failed to exhaust their administrative remedies, 7 U.S.C. § 6912(e), and contends that this requirement (too) is jurisdictional. Not so on both fronts. The exhaustion requirement in § 6912(e) does not affect our power to hear the case. Unless Congress "clearly state[s]" its intention to deprive courts of subject-matter jurisdiction, as explained, "courts should treat the [procedural] restriction as nonjurisdictional." *Kwai Fun Wong*, 135 S. Ct. at 1632 (quotations omitted). That rule applies to exhaustion requirements no less than it does to time bars. *See id.* And § 6912(e)'s exhaustion requirement does not speak in jurisdictional terms. It includes none of the "sweeping and direct" language needed to remove our power to hear unexhausted claims. *Weinberger v. Salfi*, 422 U.S. 749, 757 (1975). It instead speaks in the nomenclature of claim-processing requirements. So far, all circuits to address this question

agree. *Munsell v. Dep't of Agric.*, 509 F.3d 572, 580–81 (D.C. Cir. 2007) (collecting cases from the Fifth, Eighth, and Ninth Circuits).

Any effort to exhaust in this case, moreover, would be futile. Courts may excuse exhaustion provisions when the agency "predetermined the issue before" the plaintiff filed the lawsuit. *McCarthy v. Madigan*, 503 U.S. 140, 148 (1992). Courts have discussed the applicability of that principle under § 6912(e). *E.g.*, *Ace Prop. & Cas. Ins. Co. v. Fed. Crop Ins. Corp.*, 440 F.3d 992, 1000 (8th Cir. 2006). If administrative review would "come to naught," if any efforts before the agency would be "pointless," the courts do not insist that litigants go through the motions of exhausting the claim anyway. *Dozier v. Sun Life Assurance Co. of Can.*, 466 F.3d 532, 535 (6th Cir. 2006). "Pointless" aptly describes the Herrs' would-be administrative review. Other similarly situated Crooked Lake property owners previously challenged the lawfulness of the motorboat restrictions in 2007. But the Forest Service rejected their challenges and stood by its restrictions. And the Forest Service's defense in this lawsuit offers no reason to think it would treat the Herrs any differently, especially after it threatened criminal enforcement of the order against them. The Herrs could thus "fairly assume that the *same* [agency] would apply" the *same* standard to the *same* facts to reach the *same* result. *Cf. Dozier*, 466 F.3d at 535 (emphasis added). The law does not force them to take on hopeless causes.

For these reasons, we reverse and remand for further proceedings consistent with this opinion.