RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0165p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DAVID A. HERR; PAMELA F. HERR,
                    *Plaintiffs-Appellants*,

v.

UNITED STATES FOREST SERVICE; SONNY PERDUE,
Secretary of Agriculture; TOM TIDWELL, Chief of the
United States Forest Service; KATHLEEN ATKINSON,
Regional Forester for the Eastern Region of the United
States Forest Service; LINDA JACKSON, Forest
Supervisor, Ottawa National Forest; TONY HOLLAND,
District Ranger, Watersmeet - Iron River Ranger
Districts,

                    *Defendants-Appellees*,

SWC, LLC; TIMOTHY A. SCHMIDT; FRIENDS OF
SYLVANIA; UPPER PENINSULA ENVIRONMENTAL
COALITION,

                    *Intervenors-Appellees*.

> No. 16-2126

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 2:14-cv-00105—R. Allan Edgar, District Judge.

Argued: June 15, 2017

Decided and Filed: July 26, 2017

Before: SUTTON and DONALD, Circuit Judges; ZOUHARY, District Judge.[*]

───────────────

**COUNSEL**

**ARGUED:** Steven J. Lechner, MOUNTAIN STATES LEGAL FOUNDATION, Lakewood,
Colorado, for Appellants. Mark R. Haag, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Appellees. Howard A. Learner, ENVIRONMENTAL LAW & POLICY

───────────────

[*]The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by
designation.

CENTER, Chicago, Illinois, for Intervenors. **ON BRIEF:** Steven J. Lechner, MOUNTAIN STATES LEGAL FOUNDATION, Lakewood, Colorado, for Appellants. Mark R. Haag, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. Howard A. Learner, ENVIRONMENTAL LAW & POLICY CENTER, Chicago, Illinois, Robert L. Graham, JENNER & BLOCK, LLP, Chicago, Illinois, for Intervenors.

SUTTON, J., delivered the opinion of the court in which ZOUHARY, D.J., joined. DONALD, J. (pp. 11–13), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

SUTTON, Circuit Judge. David and Pamela Herr bought lakefront property on Crooked Lake in the Upper Peninsula of Michigan, hoping to use the lake's waters for recreational boating and fishing. The United States Forest Service had other plans. Most of Crooked Lake lies in the federally owned Sylvania Wilderness yet some of it remains under private ownership. Congress gave the Forest Service authority to regulate any use of Crooked Lake and nearby lakes "subject to valid existing rights." The Forest Service promulgated two regulations, one prohibiting gas-powered motorboats, the other limiting electrically powered motorboats to no-wake speeds throughout the wilderness area. Both regulations exceed the Forest Service's power as applied to the Herrs and the other private property owners on the lake. Under Michigan riparian-rights law, in truth littoral-rights law, lakeside property owners may use all of a lake, making the Herrs' right to use all of the lake in reasonable ways the kind of "valid existing rights" that the Forest Service has no warrant to override.

I.

Crooked Lake stretches three miles from one end to the other connected by a series of meandering channels and bays. Nestled within an old growth forest, the lake offers a variety of outdoor activities for public and private visitors from kayaking to bird watching to hiking along its shore. Fishing apparently attracts a lot of visitors as well, as the glacier lakes in the area contain "world-class smallmouth bass fisheries." *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 813 (6th Cir. 2015). Ninety-five percent of the land surrounding the lake belongs to the federally protected Sylvania Wilderness, a nature preserve open to the public. The remaining five percent,

positioned in the northern bay, belongs to approximately ten private landowners who own the property under state law.

The United States first purchased land in the area in 1966, about 14,000 acres surrounding the southern portion of Crooked Lake, to supplement the Ottawa National Forest. In 1987, Congress enacted the Michigan Wilderness Act, 101 Stat. 1274, dedicating these and other lands to the National Wilderness Preservation System as part of the Sylvania Wilderness, an area encompassing over 18,000 acres and 36 lakes.

"Subject to valid existing rights," the Michigan Wilderness Act directs the Forest Service to administer this area "in accordance with the provisions of the Wilderness Act of 1964." Pub. L. No. 100-184, § 5, 101 Stat. 1274, 1275–76 (1987). The Wilderness Act of 1964 provides that the Forest Service, a branch of the Department of Agriculture, "shall be responsible for preserving the wilderness character" of the land. 16 U.S.C. § 1133(b). It also addresses motorboat use, explaining that "subject to existing private rights . . . there shall be . . . no use of . . . motorboats" within any wilderness area. *Id.* § 1133(c). "[W]here these uses have already become established," the Act provides that they "may be permitted to continue subject to such restrictions as the [Forest Service] deems desirable." *Id.* § 1133(d)(1).

In 1992, the Forest Service amended the management plan for the Ottawa National Forest. Through what became known as Amendment No. 1, the Service prohibited the use of sailboats and houseboats on all portions of Crooked Lake within the Sylvania Wilderness. In 1993, several landowners filed a lawsuit challenging the prohibitions, *see Stupak-Thrall v. United States*, 843 F. Supp. 327, 328–29 (W.D. Mich. 1994), ominously referred to as *Stupak-Thrall I*.

*Stupak-Thrall I* ended in a victory for the Forest Service but not for the law of this Circuit. By an equally divided vote, the en banc court affirmed the district court's decision to uphold Amendment No. 1, allowing the sailboat and houseboat restrictions to remain but leaving no controlling law in its wake. *Stupak-Thrall v. United States*, 89 F.3d 1269 (6th Cir. 1996) (en banc). Neither the concurring nor the dissenting opinions at the en banc stage, nor indeed the vacated panel decision in *Stupak-Thrall I*, agreed with the district court's rationale for upholding

these restrictions. *Compare Stupak-Thrall*, 89 F.3d at 1271 (Moore, J., concurring), *with id.* at 1290 (Boggs, J., dissenting); *Stupak-Thrall v. United States*, 70 F.3d 881, 889 (6th Cir. 1995) (vacated).

The Forest Service issued another amendment to its plans for Crooked Lake in 1995. Known as Amendment No. 5, it prohibited the use of "any motor or mechanical device capable of propelling a watercraft by any means" on the wilderness portion of Crooked Lake. R. 49-4 at 1. This amendment came with an exception: one electric motor no greater than 24 volts in size or 48 pounds of thrust. Amendment No. 5 also prohibited the operation of any watercraft "in excess of a 'slow-no wake speed,'" defined as a maximum of five miles per hour. *Id.*; R. 50-8 at 23. The Forest Service eventually incorporated these restrictions into the 2006 Forest Plan and a subsequent 2007 Forest Order, which subjected violators of Amendment No. 5 to criminal liability.

Kathy Stupak-Thrall, once again joined by the Gajewskis, filed a second lawsuit. *See Stupak-Thrall v. Glickman*, 988 F. Supp. 1055 (W.D. Mich. 1997) (*Stupak-Thrall II*). The property owners won this round, securing an injunction prohibiting enforcement of Amendment No. 5. The district court held that the motorboat restrictions interfered with Thrall's "'valid existing right' to use gas motor boats on Crooked Lake" and thus fell outside the Forest Service's regulatory authority. *Id.* at 1062. It also held that Amendment No. 5, as applied to Thrall and the Gajewskis, effected a regulatory taking under the Fifth Amendment. *Id.* at 1064.

After this decision, the Forest Service "facilitate[d] the sale of the Gajewski property . . . to a third-party conservation organization," The Conservation Fund, which agreed "to resell the property after encumbering it with a conservation easement" paid for by the Forest Service. R. 53-44 at 13. Because this development "substantially" reduced motorboat use on Crooked Lake, the Forest Service voluntarily dismissed its appeal. *Id.* That left the other piece of property involved in that case protected by the injunction. To this day, Kathy Stupak-Thrall (and her guests) remain the only people free to use motorboats, though not sailboats or houseboats, on all of Crooked Lake.

When the Amendment No. 5 regulations first went into effect, David and Pamela Herr were occasional visitors to Crooked Lake.  In 2010, they made a commitment to the place, purchasing two waterfront lots on the lake's northern bay.  The Herrs bought the land with the intention of using gas-powered motorboats.  The seller confirmed these intentions, telling the Herrs that he had used motorboats in the past "without hindrance by the Forest Service." R. 4 at 11.

That turned out to be true for the Herrs as well, at first.  The Forest Service not only allowed such use at the time but facilitated it for them and others.  It regularly sold boating permits to visitors and residents—allowing them access to the lake—and allowed motorboat use through its public boat landing, located in a federally-owned portion of the northern bay just outside the wilderness area.

The Forest Service changed course in 2013.  It stopped offering motorboat access at the landing dock and sent a letter to the Herrs informing them that it planned to "fully enforce" the existing motorboat restrictions on the federal wilderness portion of the lake, though not the private portion of the lake.  R. 4-5 at 2.  The Herrs sued the Forest Service under the Administrative Procedure Act (APA), seeking to enjoin it from enforcing the motorboat restrictions against them.  *See* 5 U.S.C. § 702.  Two environmental-protection organizations and two property owners (Tim Schmidt and Sylvania Wilderness Cabins) intervened to support the Forest Service.

At the Forest Service's urging, the district court dismissed the case.  It held that the federal courts lacked subject matter jurisdiction over the dispute because the statute of limitations had run on any APA challenges to the 2007 Forest Order.  We reversed.  The limitations period, we explained, amounted to a claims-processing rule and did not create a limit on our subject matter jurisdiction.  The limitations period had not lapsed anyway, we added, because the Herrs never had an opportunity to challenge the validity of the rule's application to them until 2010, when they bought the land, and the Service had not enforced Amendment No. 5 against them until 2013.  *Herr*, 803 F.3d at 813, 819.

On remand, the district court ruled for the Forest Service again, this time on the merits. The court held that the Herrs' rights to use Crooked Lake did not "exist" at the time of the Michigan Wilderness Act's enactment, meaning that the reservation of "valid existing rights" did not apply to them. *Herr v. U.S. Forest Serv.*, 212 F. Supp. 3d 720, 727–28 (W.D. Mich. 2016).

Here we are. Again.

II.

After nearly a quarter century of litigation over the recreational uses of Crooked Lake, the parties share some common ground about the resolution of today's dispute. The parties agree with, or at least do not dispute, these features of the legal landscape.

One: The Property Clause of the United States Constitution enables Congress to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. Though Congress has broad discretion to determine what regulations it "needs" on its own property, *see Kleppe v. New Mexico*, 426 U.S. 529, 539–40 (1976), it does not have the same authority over private property, *see Camfield v. United States*, 167 U.S. 518 (1897). If private property affects public lands, the government may regulate the private property to the extent needed to "protect[]" the relevant "federal property." *Kleppe*, 426 U.S. at 538 (discussing *Camfield*); *see* Allison H. Eid, *The Property Clause and New Federalism*, 75 U. Colo. L. Rev. 1241, 1242 (2004). By way of example, Congress has authority to prevent an individual from leaving an unmonitored fire near any public "forest, timber, or [] inflammable material," even if the fire is on private property. *United States v. Alford*, 274 U.S. 264, 266–67 (1927). Congress likewise may prohibit private landowners from fencing in public property, though the fences remain on the private side of the property line. *Camfield*, 167 U.S. at 525.

Two: The national government exercised its Property Clause power here through the Michigan Wilderness Act, which granted the Forest Service authority over the Sylvania Wilderness. This specific grant of authority allowed the Forest Service to regulate the public's use of Crooked Lake for boating and related recreation, "subject to valid existing rights."

Three:   State-law riparian and littoral rights represent a form of protected rights under the Act.   *See* Forest Service Manual § 2320.5(16), http://www.fs.fed.us/cgi-bin/Directives/get_dirs/fsm?2300; Forest Service Br. 25.   Riparian rights give property owners authority to use rivers that run through or adjacent to their property.   *Dyball v. Lennox*, 680 N.W.2d 522, 526 (Mich. Ct. App. 2004).   Littoral rights give property owners authority to use lakes on or adjacent to their property.   *Bott v. Comm'n of Nat. Res. of State of Mich. Dep't of Nat. Res.*, 327 N.W.2d 838, 841 (Mich. 1982).   This case concerns littoral rights.

Under Michigan law, a littoral landowner owns the rights to the bed of any inland lake, like Crooked Lake, "to the thread or midpoint of the water."   *Id.* at 841; *Lorman v. Benson*, 8 Mich. 18, 22 (1860).   But littoral landowners also share a right to the reasonable use of the water's full surface.   *Bott*, 327 N.W.2d at 842; *see* 78 Am. Jur. 2d, Waters § 35; *Holton v. Ward*, 847 N.W.2d 1, 4–6 (Mich. Ct. App. 2014).   That means the surface of Crooked Lake, even the part in the Sylvania Wilderness, does not belong exclusively to the federal government.   So too of the surface of Crooked Lake outside the Sylvania Wilderness; it does not belong exclusively to the State or the private property owners.   The surface belongs jointly to the federal government and the private owners of state land on Crooked Lake, *both* of which maintain a littoral right to "reasonable use" of the lake's surface.   *See Tennant v. Recreation Dev. Corp.*, 249 N.W.2d 348, 349 (Mich. Ct. App. 1976); *Rice v. Naimish*, 155 N.W.2d 370, 372 (Mich. Ct. App. 1967); *see also Yates v. City of Milwaukee*, 77 U.S. 497, 499 (1870); *Hilt v. Weber*, 233 N.W. 159, 168 (Mich. 1930).

With these background principles in place, we can turn to the question at hand:   Does the Forest Service's ban on using any motorboats or any other boat that exceeds five miles per hour violate the "[1] subject to [2] valid existing [3] rights" clause of the Michigan Wilderness Act?   Yes, as an examination of each part of the clause confirms.

"Subject to."   "[S]ubject to" means "subordinate" or "subservient."   *Black's Law Dictionary* 1278 (5th ed. 1979).   That means the Forest Service's regulations must respect the Herrs' littoral rights, as the Service's ability to regulate begins where the Herrs' "valid existing rights" end.   To the extent the Herrs have the right to use a motorboat under Michigan law on Crooked Lake, the Forest Service must honor that right—must in short be "subject to" it.

"Existing." But did these littoral rights exist at the time Congress passed the Michigan Wilderness Act in 1987? Yes. Littoral rights, like most property rights, run with the land. *Thompson v. Enz*, 154 N.W.2d 473, 483 (Mich. 1967) (opinion of Kavanagh, J.). The question is not whether the Herrs had littoral rights on Crooked Lake before Congress passed the Act. It is whether the prior property owners had those rights before Congress passed the Act. They did. And they sold those rights along with the rest of the property to the Herrs in 2010. In reaching a contrary conclusion, the district court erred, as the Forest Service concedes. The Act does not refer to "valid rights of existing owners"; it refers to "valid existing rights." Because littoral and riparian rights run with the land, the Herrs purchased those "existing" rights along with others when they bought the Crooked Lake property.

"Valid Rights." That brings us to the nub of the dispute. As the Forest Service sees it, littoral and riparian rights permit property owners to use the waters only in reasonable ways, and a ban on motorboat use and a five-mile-an-hour limit on other boat use amounts to a reasonable limit for a remote body of water like Crooked Lake. The premise is correct. State law may indeed impose reasonable limits on littoral and riparian rights. *See* Mich. Comp. Laws § 324.80108; *Miller v. Fabius Twp. Bd., St. Joseph Cty.*, 114 N.W.2d 205, 208 (Mich. 1962). But the conclusion is not. When the statute refers to "valid existing rights," it asks whether the property owners have such rights under state law, not federal law, and certainly not federal law as construed by a federal agency. The Herrs plainly have such rights under state law, as ample Michigan authorities confirm. Recreational boating, the Michigan courts have repeatedly indicated, amounts to a reasonable use. *See Burt v. Munger*, 23 N.W.2d 117, 119–20 (Mich. 1946); *Rice*, 155 N.W.2d at 372; *People v. Hulbert*, 91 N.W. 211, 211–12, 218 (Mich. 1902); *Pierce v. Riley*, 264 N.W.2d 110, 114 (Mich. Ct. App. 1978); *Tennant*, 249 N.W.2d at 349.

Not just these legal authorities, but the facts as well, point in this direction. Landowners and visitors have used motorboats on Crooked Lake since the 1940s. *Stupak-Thrall II*, 988 F. Supp. at 1059. Longstanding prior use is one indicator that a co-riparian (a term used by Michigan courts to cover littoral and riparian landowners) acts reasonably relative to others. *Dumont v. Kellogg*, 29 Mich. 420, 425 (1874).

No doubt, Michigan could have regulated motorboat use on Crooked Lake during this time. *See* Mich. Comp. Laws § 324.80108. And it may even be possible that it could have banned motorboats, though at the risk of imposing a regulatory taking under the State or Federal Constitutions. *See Difronzo v. Vill. of Port Sanilac*, 419 N.W.2d 756, 758 (Mich. Ct. App. 1988). But the key point is that it never did. All agree that Michigan law permits motorboat use on the northern bay of the lake, outside the Sylvania Wilderness. The best evidence of reasonable use under Michigan law is what Michigan law allows on *this* lake. To our knowledge, no co-riparian has challenged the Herrs' (or anyone else's) use of gas-powered motorboats on this part of Crooked Lake.

No less significantly, the Forest Service long allowed motorboat use on all of the lake after it obtained this regulatory authority. And it still does with respect to one property owner. Until 2013, the Service not only allowed motorboat use, but it also facilitated such use by selling boating permits and allowing the public to use a loading dock on federal land. It never appealed the injunction in *Stupak-Thrall II*, which means that one of the ten property owners on the lake (and her guests) currently may use motorboats on all of the lake. How odd to allow one property owner to operate motorboats on the lake, while trying to exclude the other nine. If motorboat use is objectively unreasonable for one, it is objectively unreasonable for all.

That does not mean the Herrs have a right to use any size boat at any speed on any part of the lake, as the district court worried. The Herrs have a right to *reasonable* use of the lake. That means a right to travel at reasonable speeds within the lake. But the Forest Service has not shown that it would be *unreasonable* under Michigan law to travel on 95% of the lake above a low-wake-zone speed. If you think otherwise, try being at one end of a three-mile lake with a five-mile-an-hour speed limit as an unexpected storm sets in.

A pre-existing use, we suppose, may not invariably amount to a right in all settings. But Michigan law tells us that boating is typically one stick in the bundle of littoral and riparian rights. Only if boating on this lake would be unreasonable under state law could we say otherwise. The long history of pre-existing use confirms that it is not unreasonable to use a gas-powered motorboat at speeds above five miles per hour on Crooked Lake.

The Forest Service tries to ground its authority to ban gas-powered motorboats in state law and the Wilderness Act itself. Neither source delivers. The Forest Service tells us that it can regulate littoral and riparian rights under the Property Clause to the same extent that state regulators can regulate them. Maybe; maybe not. But we need not decide. For the Michigan Wilderness Act does not grant the Forest Service a power coextensive with Congress' plenary authority under the Property Clause. It instead delegates a power limited by existing rights— "subject to valid existing rights." For that reason, any "police power" the Forest Service may have must respect pre-existing property rights, not just the limits of state power. Unless or until the State permissibly says otherwise, littoral property rights include the right to reasonable use of the water's surface for recreational motorboating. No matter how reasonable the Forest Service may think this regulation is, it has no power to nullify the Herrs' pre-existing right under Michigan law to use the lake for recreational motorboating.

That the Wilderness Act contemplates "desirable" regulation of pre-existing motorboat use ignores the fact that the Michigan Wilderness Act makes the Forest Service's authority to enforce the Wilderness Act subject to independent limitations. Though the Michigan Wilderness Act provides that the Forest Service is to manage this area "in accordance" with the Wilderness Act, it also provides that such management is "[s]ubject to valid existing rights." Pub. L. No. 100-184, § 5, 101 Stat. 1274, 1275–76 (1987). That limitation remains controlling.

All of this does not leave the Forest Service or the Herrs' neighbors without options. Fellow riparians may enjoin unreasonable uses under state law through the state and federal courts. They may petition the State of Michigan to change the boating rules on the surface of Crooked Lake. Or they may pay the Herrs for an easement on their property, which would limit motorboat use in the same way the Gajewskis' property became limited. Even the serenity of nature sometimes comes at a price.

For these reasons, we reverse.

—————————

**DISSENT**

—————————

BERNICE B. DONALD, Circuit Judge, dissenting.  I agree with the majority that the Herrs have valid existing rights to which any regulation by the Forest Service must be subservient.  I agree also that the district court erroneously concluded that the Herrs' rights were not "existing" because the Herrs purchased their land after the Forest Service passed Amendment No. 5.  Where I disagree, however, is with the majority's conclusion that a federal agency, in the same manner as a state, may not impose reasonable restrictions on littoral and riparian rights, when expressly authorized by Congress to do so.

First, as the Supreme Court has held, "[t]he general government doubtless has a power over its own property analogous to the police power of the several states, and the extent to which it may go in the exercise of such power is measured by the exigencies of the particular case." *Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976) (citing *Camfield v. United States*, 167 U.S. 518, 525 (1897)).  This also "includes the power to regulate in a manner affecting non-federal property." *Burlison v. United States*, 533 F.3d 419, 432 (6th Cir. 2008).  As such, the power of Congress to regulate under the Property Clause "may have some effect on private lands not otherwise under federal control." *Id.* (quoting *Kleppe*, 426 U.S. at 546).  Second, as even the majority notes, Congress has authorized the Forest Service to regulate the Sylvania Wilderness. This authority, "subject to valid existing rights," is coextensive with Congress' own authority under the Property Clause when the Forest Service acts to preserve the wilderness character of the Sylvania Wilderness. It thus follows that the Forest Service possesses a power that is "analogous to the police power of the several states," and where the Forest Service does not exceed the scope of the permissible police power of the state, it may exercise this power.

It is important then that we first examine the scope of the state's power to regulate littoral and riparian rights.  In Michigan, "[t]he rights associated with riparian ownership generally include . . . the right to a reasonable use of the water for general purposes such as boating, domestic use, etc." *Tennant v. Recreation Dev. Corp.*, 249 N.W.2d 348, 349 (Mich. Ct. App. 1976).  These rights, however, are not without limitation.  To protect the public safety, Michigan

permits regulation of the operation of vessels on the waters of the state. Mich. Comp. Laws § 324.80108. To this end, Michigan courts have upheld restrictions from local governments as they relate to the riparian and littoral rights of citizens within their jurisdictions. *See, e.g., Square Lake Hills Condominium Ass'n v. Bloomfield Twp.*, 471 N.W.2d 321, 326 (Mich. 1991) (permitting Bloomfield Township to regulate boat docking and launching on inland lakes under the township's police power); *Miller v. Fabius Twp. Bd.*, 114 N.W.2d 205, 209 (Mich. 1962) (allowing time regulations on water skiing).

Recognizing that the state may impose such regulations, the majority nevertheless concludes that the Forest Service may not regulate Crooked Lake in this manner because Michigan has not imposed such restrictions itself. But Forest Service's powers, while restricted, do not depend on state action. Put another way, state law determines the scope of the Forest Service's authority to regulate the surface of Crooked Lake because Congress has placed the specific constraint of "subject to valid existing rights"; rights that are determined by state law. But state regulation is not a prerequisite to the Forest Service's ability to regulate. The determining factor, rather, is whether the regulation is a proper exercise of the state's police power. And, as previously mentioned, Michigan state law confirms that restrictions on kinds of vessels and speed of motorboats are permissible.

The next question is the reasonableness of the restriction. "The reasonableness of an ordinance . . . depends upon the particular facts of each case. The test for determining whether an ordinance is reasonable requires us to assess the existence of a rational relationship between the exercise of police power and the public health, safety, morals, or general welfare in a particular manner in a given case." *Square Lake Hills*, 471 N.W.2d at 324 (citation omitted). As the district court noted, Amendment No. 5's restrictions are rationally related to achieving the Michigan Wilderness Act's goal of preserving the wilderness character of Sylvania. Also, these restrictions are certainly reasonable. Amendment No. 5 does not ban the use of all motorboats on the surface of Crooked Lake; rather, it merely restricts the use of gas-powered motorboats, the size of the motor, and the speed at which a boat may travel on ninety-five percent of the lake.

The majority approaches the issue of reasonableness by looking at whether recreational boating constitutes reasonable use under Michigan law. I agree that the use of gas-powered

motorboats is generally not unreasonable under Michigan law; but this alone is not dispositive of whether the Forest Service's ban of such use on Crooked Lake is unreasonable.  Neither is the fact that the Forest Service has previously allowed motorboat use on the entire surface of Crooked Lake.  As the majority notes, a pre-existing use does not always amount to a right.  Initially, what was reasonable in the past is not necessarily reasonable today.  But more importantly, the Herrs' right to engage in recreational motorboating under Michigan law, which does not necessarily equate to a *right* to use gas-powered motorboats, is not immune from reasonable future regulation.  "Congress chose to 'grandfather' private rights in the 'subject to valid existing rights' phrase, but in doing so, it never intended that those rights be ossified against further regulation."  *Stupak-Thrall v. United States*, 89 F.3d 1269, 1271 (6th Cir. 1996) (memo) (Moore, J., concurring in order affirming district court opinion by divided en banc vote).

Ultimately, I believe that Amendment No. 5 was squarely within the Forest Service's authority to enact, and that the restrictions do not infringe on the Herrs' "valid existing rights."  For these reasons, I would affirm the district court.  I respectfully dissent.